**In re EASTERN AND SOUTHERN DISTRICTS ASBESTOS LITIGATION.**

**This document applies to: All Brooklyn Naval Yard Shipyard Cases.**

**No. NYAL 4000.**
**No. TS 90–9999.**

United States District Court,
E. and S.D. New York.

Aug. 30, 1991.

Steven J. Phillips, Moshe Maimon, Alani Golanski, Levy, Phillips & Konigsberg, New York City, for plaintiffs.

Joyce A. Lagnese, Frank H. Santoro, Danaher, Tedford & Lagnese, Hartford, Conn., for Pittsburgh Corning and Fibreboard.

Louis C. Woolf, Baker, Worthington, Crossley, Stansberry & Woolf, Knoxville, Tenn., for Owens Illinois.

Richard P. O'Leary, McCarter & English, Newark, N.J., for Keene.

Steven M. Sold, Gordon & Silber, New York City, for Manville Personal Injury Settlement Trust.

JACK B. WEINSTEIN, District Judge:

I. Introduction .................................................. 1384

II. Facts ........................................................ 1385

III. Propriety of Consolidation .................................. 1387

IV. *Erie* Concerns and State Decisional Law .................... 1388

V. General Obligations Law Section 15–108 ...................... 1391
 A. The Statute and Legislative History .................... 1391
 B. Method of Calculation of G.O.L. § 15–108 Set–Offs ...... 1393
 C. The Manville Personal Injury Settlement Trust .......... 1397
 1. Phase II and Phase III Trials .................... 1397
 2. Phase I Trials ................................... 1399
 D. Reallocation of Nonparty and Bankrupt Shares .......... 1399

VI. Actions Subject to Article 16 of New York Civil Practice Law and Rules .... 1403

VII. Flintkote .................................................. 1405

VIII. Vernon Green: A Two–Injury Case .......................... 1406

IX. Interest Pursuant to New York Estate, Powers and Trust Law Section
 5–4.3 ........................................................... 1407
 A. Non-settling Defendants.......................................... 1407
 B. The Manville Trust .............................................. 1410

X. Collateral Source Payments ......................................... 1410

XI. Calculations With Respect to Future Damages ......................... 1410

XII. Order of Computation ............................................... 1411

XIII. Remaining Motions.................................................. 1412

XIV. Conclusion ........................................................ 1412

## MEMORANDUM AND ORDER

### I. INTRODUCTION

The New York Naval Shipyard, located in Brooklyn, is commonly referred to as the Brooklyn Navy Yard. It was the construction site of many of the nation's finest and most powerful naval vessels. During World War II and for the next thirty years thereafter, thousands of its workers were exposed to dangerous airborne asbestos fibers without being advised of the potential health consequences. The Navy, though aware of the hazards posed by asbestos dust, in its urge to build its warships as quickly as possible, did not inform workers of the dangers and neglected to take available protective precautions. The United States now disclaims liability from behind its shield of sovereign immunity. Those injured have therefore turned to the manufacturers for redress, basing their claims on lack of warning on products or packaging.

Latency before manifestation of asbestos diseases is often measured in decades. By the early 1970's, increasing numbers of Navy Yard workers were experiencing asbestos-related injuries from exposure beginning as early as the 1930's. Since the New York statutes of limitations ran from date of exposure, not discovery, their claims were barred. It was not until 1986 that New York amended its statute of limitations to start its running on discovery of the disease. Previously barred suits were allowed to be filed. The result was a large influx of asbestos cases into New York's state and federal courts.

The Eastern and Southern Districts of New York have consolidated all asbestos cases filed in either district for pretrial and control purposes before Judge Charles P. Sifton. Brooklyn Navy Yard cases were assigned to Judge Jack B. Weinstein. He presided over a series of settlements and trials involving personal injury and wrongful death that allegedly resulted from exposure to asbestos in the course of employment at the Yard.

Following the jury verdicts, the parties have filed a number of post-trial motions. Defendants challenge the propriety of the consolidated trials, a contention without substantial merit. All parties pose a series of difficult questions on how the jury verdict should be molded in the light of a variety of recent New York statutes.

The process of translating the jury verdicts into judgments in New York is governed by an extremely complex statutory scheme. It is one example of a wave of "tort reform" that swept the country in the 1980's. *See generally* P. Schuck, *Tort Law and the Public Interest: Competition, Innovation and Consumer Welfare* (ed. 1991); Gellis, *Legislative Reforms of Governmental Tort Liability: Overreacting to Minimal Evidence*, 21 Rutgers L.Rev. 375 (1990); Priest, *Modern Tort Law and Its Reform*, 22 Valparaiso L.Rev. 1 (1987). Amid a furor of private and public sector sentiment fearful of increased litigation

and its costs, every state legislature considered some form of tort reform legislation between 1985 and 1987 and forty-two states enacted statutes. Priest, *supra*, at 3; *see Selected State Legislative Action Re: Affordability and Availability of Liability Insurance* (National Conference of State Legislatures Aug. 4, 1986). New York's legislative battles yielded a statutory scheme built on compromises resulting in ambiguities, inconsistencies and difficulties in administration. The effect and meaning of many of the provisions remains uncertain. Much of the New York tort reform legislation, two authors suggest, "imposes complexities never before saddled on our overburdened bench and ... bar." Kelner & Kelner, *Trends in CPLR Articles 50A and 50B*, N.Y.L.J. Aug. 27, 1991, at 6.

The statutory plan for molding jury verdicts into judgments in New York distinguishes between 1) actions filed as revived personal injury cases previously barred by the old statute of limitations, 2) revived wrongful death actions, 3) tort reform personal injury claims and 4) tort reform wrongful death cases. *See* McKinney's 1986 Sessions Laws of New York, ch. 682; N.Y. C.P.L.R. § 214–c(2). Examples of all four of these categories are found among the seventy-nine jury verdicts now before the court.

This memorandum addresses questions that remain concerning the jury verdicts in the consolidated Navy Yard trials. Among them are: First, what is the proper method for computing the set-off provided for in New York General Obligations Law section 15–108? Second, under section 15–108 how should shares of fault attributed by the jury to nonparties or bankrupt entities be handled? Third, how should the share allocated to the Manville Personal Injury Settlement Trust be calculated? Fourth, in cases brought under the tort reform statute enacted in 1986, does Article 16 of the New York General Obligations Law dictate that a plaintiff's award of non-economic damages be reduced by the amount of damages or share of fault attributable to nonparties who for reasons of bankruptcy or diversity could not be brought into the action? Fifth, should prejudgment interest awardable under New York Estate, Powers and Trust Law section 5–4.3(a) apply to the entire verdict including sums awarded for future losses and what is the rate? Sixth, in tort reform actions, what is the proper discount rate to apply in reducing future economic damages to present value? Seventh, what is the order in which calculations should be made?

Finally, challenges have been asserted to particular awards and findings made by the jury. None of them have any merit, except in one case where the court found that there was no proof of liability on the part of one defendant and the jury attributed a percentage of liability to that defendant. In every other instance the jury's awards were fully supportable by the evidence.

## II. FACTS

On January 18, 1990 Judge Sifton and Judge Weinstein held a joint conference to consider means for resolving common legal and factual issues arising in cases of workers exposed to asbestos while working in the Brooklyn Navy Yard. On January 22, 1990 several hundred personal injury and wrongful death asbestos cases with a substantial nexus to the Brooklyn Navy Yard were reassigned to Judge Weinstein for all purposes. This Judge has also been designated to sit as a Judge of the Southern District continuously since January 23, 1990.

A similar consolidation of several hundred Navy Yard cases was assigned to State Supreme Court Justice Helen E. Freedman. The state and federal courts embarked upon a cooperative program for the handling of these Brooklyn Navy Yard cases. The joint federal and state consolidation totalled over 600 cases with plaintiffs claiming compensatory damages in the hundreds of millions of dollars and punitive damages in the billions.

Justice Freedman and this court jointly appointed Kenneth R. Feinberg as Referee and Settlement Master. *In re Joint Eastern & Southern Dists. Asbestos Litig.*, 129 F.R.D. 434 (E. & S.D.N.Y. & N.Y.Sup.Ct. 1990). With his invaluable assistance, the

majority of plaintiffs settled almost all of their claims against the nearly 100 manufacturers and distributors initially sued. Some cases settled entirely; some went to trial against a few manufacturers.

Proceeding on an expedited basis, the Brooklyn Navy Yard cases were divided into three categories for purposes of trial: Phase I consisted of cases in which over 90% of plaintiffs' exposure to asbestos occurred in the Yard; Phase II encompassed cases in which between 50% and 90% of plaintiffs' exposure took place in the Yard; Phase III covered all remaining cases involving Yard exposure to asbestos. While the state and federal courts initially set the cases for a joint trial, in view of the extensive settlements separate state and federal trials of the relatively small number of remaining cases appeared more desirable.

On September 10, 1990 sixty-four Phase I cases proceeded to trial in the federal court against the following defendants: Owens–Illinois, Fibreboard, Pittsburgh Corning, Keene and the Manville Trust. At the outset of the trial, each side presented teaching witnesses to educate the jurors generally about asbestos and introduce relevant medical and epidemiological studies on its effects. It was anticipated that the same jury would sit in all phases of the trials and therefore special attention was paid to training them.

The jurors were devoted to their work and gave sustained attention to the evidence. They were selected after filling out a searching written questionnaire prepared by counsel and court. Each juror chosen was aware that his or her work would require many months of painstaking effort. Each had a notebook with key documents, a photograph of each injured person and a summary of each case. Each juror took extensive notes using steno pads and pencils supplied by the parties. A photograph of each of the more than one hundred and twenty witnesses was made available to the jury to refresh its memory. Summaries of depositions and detailed evidence and witness lists as well as full records of all medical history were sent to the jury room. Interim summations by counsel and

short interim charges and explanations during trial were given by the court. Detailed charge sheets of some fifteen pages for each of the seventy-nine cases were filled out by the jurors (a total of more than a thousand pages of questions), enabling them to focus precisely on the issues. Where the law was unclear, alternate questions were put to the jury embodying the different legal theories to avoid the necessity of a retrial. Strict control over experts and extensive video and other depositions was relied on to reduce costs per case and to speed the trials. Much of the documentary evidence was studied by the jury in the jury room, avoiding hundreds of hours of courtroom time. Extensive use of slides, charts and other visual devices assisted the jurors. In all respects able counsel and distinguished expert witnesses on both sides cooperated to lend an air of dignity and clarity to the proceedings. The parties had as fair a trial as the court was capable of giving them.

All issues were tried at once in each case. After four months of evidence and argument and four weeks of deliberation in Phase I, the jury returned plaintiffs' verdicts in fifty-two cases and defense verdicts in twelve cases. Damages totalled $30,659,658.80. No punitive damages were awarded. All companies which shipped asbestos-containing products to the Navy Yard were found liable to some of the plaintiffs as a result of their failure to warn workers of health risks that attend exposure to asbestos fibers.

At the conclusion of the trial, the jury was temporarily discharged with the understanding it would reconvene during a subsequent trial of cases in Phases II and III scheduled for February. Special Master Feinberg continued settlement discussions with the parties during and following the first trial. His efforts were largely successful. A second consolidated trial of the unresolved Brooklyn Navy Yard cases commenced on February 19, 1991. Only fifteen cases remained for trial of claims against one or more of three defendant manufacturers: Empire Ace, Fibreboard and Keene. On April 16 the jury rendered its verdicts: twelve in favor of plaintiffs and

three for the defense. Total damages awarded in Phases II and III amounted to $7,388,877, with no punitive damages.

With the conclusion of the second trial, all Brooklyn Navy Yard cases filed in the federal courts in the Eastern and Southern Districts of New York pending as of February 18, 1991 had been either settled or tried to verdict. In the meantime jury trials were being conducted before Justice Freedman in the state court. The jury in those cases brought in verdicts more than three times as high as those in the federal court. The state jury also imposed punitive damages while, as noted, the federal jury found no reason to assess punitive damages in any case.

## III. PROPRIETY OF CONSOLIDATION

■ Consolidations have become increasingly necessary in tort cases generally, and asbestos cases in particular. *See, e.g., Hendrix v. Raybestos–Manhattan, Inc.,* 776 F.2d 1492 (11th Cir.1985); *Neal v. Carey Canadian Mines, Ltd.,* 548 F.Supp. 357 (E.D.Pa.1982), *aff'd sub nom. Van Buskirk v. Carey Canadian Mines, Ltd.,* 760 F.2d 481 (3d Cir.1985); *Wilson v. Johns–Manville Sales Corp.,* 107 F.R.D. 250 (S.D.Tex.1985). The recent decision by the Judicial Panel on Multidistrict Litigation to consolidate all asbestos personal injury and wrongful death cases seriously undermines the defendants' contentions that the present consolidation exceeded the court's discretion and violated due process. *In re Asbestos Prods. Liab. Litig.* (No. VI), 771 F.Supp. 415 (Jud. Pan. on MDL 1991). In choosing to transfer the cases pursuant to section 1407 of Title 28 of the United States Code, the Panel found that the cases involve similar questions of law and fact. *Id.* at 416–17 ("the Panel finds that the actions in this litigation involve common questions of fact relating to injuries or wrongful death allegedly caused by exposure to asbestos"). Moreover, the Panel emphasized "that this litigation has reached a magnitude ... that threatens the administration of justice and that requires a new, streamlined approach." *Id.* at 418.

To avoid unnecessary costs or delay, Rule 42(a) of the Federal Rules of Civil Procedure permits a federal court to consolidate actions for trial when there are common questions of law or fact. Fed. R.Civ.P. 42(a). *See Johnson v. Celotex Corp.,* 899 F.2d 1281, 1284 (2d Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 297, 112 L.Ed.2d 250 (1990); *Ellerman Lines, Ltd. v. Atlantic & Gulf Stevedores, Inc.,* 339 F.2d 673 (3d Cir.1964), *cert. denied,* 382 U.S. 812, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965).

■ The trial court has broad discretion in determining whether to consolidate actions. *See Romacho v. Stanley,* 567 F.Supp. 1417, 1419 n. 2 (S.D.N.Y.1983), *aff'd sub nom. Morse v. Stanley,* 732 F.2d 1139 (2d Cir.1984). As federal court dockets burgeon, interests of judicial economy and efficiency gain importance. Nevertheless, considerations of convenience must yield when consolidation threatens to deny litigants a fair trial. *Arnold v. Eastern Air Lines, Inc.,* 712 F.2d 899 (4th Cir.1983) (en banc), *cert. denied,* 464 U.S. 1040, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984); *Flintkote Co. v. Allis–Chalmers Corp.,* 73 F.R.D. 463 (S.D.N.Y.1977).

The Second Circuit has set forth criteria that the district court must consider in making determinations concerning consolidation:

> [W]hether the specific risks of prejudice and possible confusion [are] overborne by the risk of inconsistent adjudications of common factual and legal issues, the burden on parties, witnesses, and available judicial resources posed by multiple lawsuits, the length of time required to conclude multiple suits as against a single one, and the relative expense to all concerned of the single-trial, multiple-trial alternatives.

*Johnson,* 899 F.2d at 1285 (quoting *Hendrix v. Raybestos–Manhattan, Inc.,* 776 F.2d 1492, 1495 (11th Cir.1985)) (citations omitted). In *In re Maryland Asbestos Cases,* the court offered the following examples of factors that tended to support consolidation of asbestos cases pending in that district,

(1) common worksite; (2) similar occupation; (3) similar time of exposure; (4) type of disease; (5) whether plaintiffs were living or deceased; (6) status of discovery in each case; (7) whether all plaintiffs were represented by the same counsel; and (8) type of cancer alleged. *In re All Asbestos Cases Pending in the United States District Court for the District of Maryland,* slip op. (D.Md. Dec. 16, 1983); *see also In re Joint Eastern & Southern Dists. Asbestos Litig.,* 125 F.R.D. 60, 64 (E.D.N.Y.1989) (discussing Maryland and other consolidations).

Several of these criteria are present in the Brooklyn Navy Yard cases. A strong geographic nexus tied these asbestos cases together through plaintiffs' exposure at one worksite, the Brooklyn Navy Yard. The plaintiffs were represented by a few law firms and sued the same former manufacturers and distributors of asbestos-containing products. Extensive overlap in witnesses, primarily former co-workers attesting to product identification at this worksite and medical and epidemiological experts, saved litigants time and money. The years of exposure spanned the period during which asbestos was utilized at the Navy Yard, beginning in the 1930's through the early 1970's.

The jury was repeatedly instructed to consider each case individually. *Cf. Johnson,* 899 F.2d at 1285. Detailed separate verdict sheets were prepared for each plaintiff, greatly minimizing any confusion that might otherwise flow from the consolidation. The time the jury took during deliberations and their sequential requests for medical and other records and reading of testimony in each case attests to their careful and individualized treatment of each cause of action. Their precisely calculated and discriminating verdicts similarly reflect this attention to the variations in the cases. All verdicts were internally consistent and consistent with each other and the evidence.

The transfer of all Southern and Eastern District Brooklyn Navy Yard cases to the Eastern District of New York for joint trial was proper. Transfer and consolidation took place *nunc pro tunc* from the time of the beginning of trial or before. *Cf. In re Joint Eastern & Southern Dists. Asbestos Litig. (Powerhouse Cases),* 769 F.Supp. 85 (E. & S.D.N.Y.1991).

## IV. *ERIE* CONCERNS AND STATE DECISIONAL LAW

These cases raise several difficult questions of interpretation of state law. A brief discussion of *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and its application in instances of conflicting or sparse state authority seems useful at the outset.

When a federal court presides over a diversity case, New York substantive law governs. *Id.; see* 28 U.S.C. § 1652 ("The laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply."). Subsequent cases instruct that a federal court is to adjudicate state disputes

> in the same manner as a federal court resolves an evolving issue of federal law: "with the aid of such light as [is] afforded by the materials for decision at hand, and in accordance with the applicable principles for determining state law."

*Salve Regina College v. Russell,* — U.S. ——, 111 S.Ct. 1217, 1218–19, 113 L.Ed.2d 190 (1991) (quoting *Meredith v. Winter Haven,* 320 U.S. 228, 238, 64 S.Ct. 7, 12–13, 88 L.Ed. 9 (1943)).

In *Swift v. Tyson,* 16 Pet. (41 U.S.) 1, 18, 10 L.Ed. 865 (1842), the Supreme Court concluded that the Rules of Decision Act's reference to the "laws of the several states" compelled federal courts to apply state positive law, such as statutes and constitutions. Only state decisional law interpreting local statutes was considered to fall within a state's positive law:

> In all the various cases, which have hitherto come before us for decision, this Court have uniformly supposed, that the true interpretation of the thirty-fourth section limited its application to state laws strictly local, that is to say, to the

positive statutes of the state, and the construction thereof adopted by the local tribunals....

*Id.* at 18–19; *see also* C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4502, at 4–6 (2d ed. 1982 & Supp. 1991). Since it is state statutes that the court is now interpreting, even before *Erie* it would have been bound by state law. *Erie,* of course, greatly expanded the scope of federal deference to state law and predicated that expansion on constitutional requirements. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 77–78, 58 S.Ct. 817, 822–23, 82 L.Ed. 1188 (1938) ("If only a question of statutory construction were involved, we should not be prepared to abandon a doctrine so widely applied throughout nearly a century [*Swift v. Tyson*]. But the unconstitutionality of the course pursued has now been made clear....").

Following *Erie,* state court decisions were accorded significantly enhanced weight. Intermediate state court pronouncements of state law were held to deserve persuasive, if not decisive, consideration in the absence of a ruling from the state's highest court. *See Stoner v. New York Life Ins. Co.,* 311 U.S. 464, 61 S.Ct. 336, 85 L.Ed. 284 (1940); *West v. American Tel. & Tel. Co.,* 311 U.S. 223, 236–37, 61 S.Ct. 179, 183–84, 85 L.Ed. 139 (1940); *Six Cos. of California v. Joint Highway Dist.,* 311 U.S. 180, 61 S.Ct. 186, 85 L.Ed. 114 (1940). *But see* Friendly, *In Praise of Erie—And of the New Federal Common Law,* 39 N.Y.U. L.Rev. 383, 400 (1964) (characterizing these decisions as "the excesses of 311 U.S. as to the respect that federal judges must pay to decisions of lower state courts") (citation omitted).

The question of how a federal court ascertains and applies state decisional law remain subject to some differing views with respect to the initiative a federal court should take in explicating state statutes. *Compare Wilson v. Asten–Hill Mfg. Co.,* 791 F.2d 30, 32 (3d Cir.1986) (federal court in applying substantive law of state in which it sits must predict how state's highest court would rule) *and Weiss v. United States,* 787 F.2d 518, 525 (10th Cir.1986)

(same) *with Shaw v. Republic Drill Corp.,* 810 F.2d 149, 150 (7th Cir.1987) ("[o]ur policy will continue to be one that requires plaintiffs desirous of succeeding on novel state law claims to present those claims initially in state court") *and Anderson v. Marathon Petroleum Co.,* 801 F.2d 936, 942 (7th Cir.1986) (unwilling to predict new trends in state jurisprudence). The Ninth Circuit recently stated:

> We note that the rule in other circuits is that the federal courts have limited discretion in a diversity case "to adopt untested legal theories brought under the rubric of state law." *Affiliated FM Ins. Co. v. Trane,* 831 F.2d 153, at 155 (7th Cir.1987).... For better or worse, this circuit has not seen fit to assume such a posture of restraint when it comes to deciding novel questions of state law.

*Torres v. Goodyear Tire & Rubber Co.,* 867 F.2d 1234, 1238 n. 1 (9th Cir.1989) (citations omitted); *see also Cooper v. American Airlines,* 149 F.2d 355, 359 (2d Cir.1945) ("What would be the decision of reasonable intelligent lawyers, sitting as judges of the highest New York court, and fully conversant with New York 'jurisprudence'?").

Under current Second Circuit practice, acting in effect as a state trial tribunal, this court must carefully review available resources to predict how the New York Court of Appeals would resolve the questions at bar. *See Minotti v. Lensink,* 798 F.2d 607, 610–11 (2d Cir.1986) (predicting Connecticut law), *cert. denied,* 482 U.S. 906, 107 S.Ct. 2484, 96 L.Ed.2d 376 (1987); *see also Commercial Union Ins. Co. v. Bituminous Cas. Corp.,* 851 F.2d 98, 101–04 (3d Cir.1988) (New Jersey law). *See generally* Clark, *State Law in the Federal Courts: The Brooding Omnipresence of Erie v. Tompkins,* 55 Yale L.J. 267, 290–95 (1946) (discussing how to ascertain state law where it is unsettled); Corbin, *The Laws of the Several States,* 50 Yale L.J. 762 (1941). The ultimate goal is to achieve uniformity of result independent of whether a case is brought in state or in federal court pursuant to diversity jurisdiction. *See Guaranty Trust Co. v. York,* 326 U.S.

99, 109, 65 S.Ct. 1464, 1469–70, 89 L.Ed. 2079 (1945).

The best authority on the meaning of state statutes is the state's highest court. *See Sanchez v. United States*, 696 F.2d 213, 216 (2d Cir.1982). In absence of pertinent holdings from that tribunal, other sources must be surveyed for insight into the meaning of a particular legislative enactment. The Supreme Court has explained:

> If there be no decision by th[e state's highest] court then federal authorities must apply what they find to be the state law after giving "proper regard" to relevant rulings of other courts of the State.

*Commissioner v. Estate of Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967); *see also Huddleston v. Dwyer*, 322 U.S. 232, 236, 64 S.Ct. 1015, 1017–18, 88 L.Ed. 1246 (1944) ("It is the duty of the federal appellate courts, as well as the trial court, to ascertain and apply the state law where, as in this case, it controls decision.") (citation omitted). "When presented with an absence of controlling state authority, we must 'make an estimate of what the state's highest court would rule to be its law.'" *DeWeerth v. Baldinger*, 836 F.2d 103, 108 (2d Cir.1987), *cert. denied*, 486 U.S. 1056, 108 S.Ct. 2823, 100 L.Ed.2d 924 (1988) (quoting *Stafford v. International Harvester Co.*, 668 F.2d 142, 148 (2d Cir. 1981)).

■ While a federal court is not bound by lower state court decisions, they do have great weight in informing the court's prediction on how the highest court of the state would resolve the question. Absent strong evidence that the New York Court of Appeals would decide the issue differently, rulings of the intermediate state appellate courts are particularly persuasive evidence of state law. *See, e.g., Puckett v. Tennessee Eastman Co.*, 889 F.2d 1481, 1485 (6th Cir.1989); *Maseda v. Honda Motor Co.*, 861 F.2d 1248, 1256 n. 14 (11th Cir.1988); *Weiss v. United States*, 787 F.2d 518, 525 (10th Cir.1986) (federal courts must follow state intermediate court decisions, trends and underlying policies of those). *But cf. Competex, S.A. v. Labow*,

783 F.2d 333, 341 n. 16 (2d Cir.1986) (federal court of appeals not bound to follow state trial court decision where it believes that the state's highest court would disagree).

The Third Circuit in *McKenna v. Ortho Pharmaceutical Corp.*, 622 F.2d 657 (3d Cir.), *cert. denied*, 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 237 (1980), described the required analytical process as follows:

> An accurate forecast of Ohio's law, as it would be expressed by its highest court, requires an examination of all relevant sources of that state's law in order to isolate those factors that would inform its decision. The primary source that must be analyzed of course, is the decisional law of the Ohio Supreme Court.... [R]elevant state precedents must be scrutinized with an eye toward the broad policies that informed those adjudications, and to the doctrinal trends which they evince.... Of somewhat less importance to a prognostication of what the highest state court will do are decisions of lower state courts and other federal courts. Such decisions should be accorded "proper regard" of course, but not conclusive effect.... Thus, under some conditions, federal authority may not be bound even by an intermediate state appellate court ruling. Additionally, federal courts may consider scholarly treatises, the Restatement of Law, and germane law review articles—particularly, it seems, of schools within the state whose law is to be predicted.

*Id.* at 662–63; *see also Rettinger v. American Can Co.*, 574 F.Supp. 306, 310–11 (M.D.Pa.1983) (exploring state law public policies in ascertaining how state's highest court would rule).

■ Well-settled principles, which are applied in New York, direct that the words and language of the statute constitute the best indication of its proper construction. *See, e.g., West Virginia University Hosp., Inc. v. Casey*, —— U.S. ——, 111 S.Ct. 1138, 1148, 113 L.Ed.2d 68 (1991); *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982). The statute's language should be given its

natural and obvious meaning. *See Demarest v. Manspeaker*, —— U.S. ——, 111 S.Ct. 599, 604, 112 L.Ed.2d 608 (1991); N.Y. Statutes Law § 76. While the statutory language is the best source of authority, in instances of ambiguity the court will turn to the legislative history and other interpretive tools for assistance. A literal reading of the statute should not yield a result patently at odds with the stated goal of the legislation. *Cf. Guiseppi v. Walling*, 144 F.2d 608, 624 (2d Cir.1944), *aff'd sub nom. Gemsco, Inc. v. Walling*, 324 U.S. 244, 65 S.Ct. 605, 89 L.Ed. 921 (1945). As observed in *Haberman v. Finch*, 418 F.2d 664, 666 (2d Cir.1969), "courts should enforce a statute in such a manner that its overriding purpose will be achieved, even if the words used leave room for a contrary interpretation." *Id.* at 666; *see also Bulk Oil (U.S.A.) Inc. v. Sun Oil Trading Co.*, 697 F.2d 481, 486 n. 12 (2d Cir.1983) ("[o]ur function is not to read the statute literally but to give effect to the legislative intent").

New York law accords particular significance to the legislative purpose and history for a statute's proper construction. *Abood v. Hospital Ambulance Serv., Inc.*, 30 N.Y.2d 295, 298, 283 N.E.2d 754, 756, 332 N.Y.S.2d 877, 879 (1972); *see Williams v. Williams*, 23 N.Y.2d 592, 599, 246 N.E.2d 333, 337, 298 N.Y.S.2d 473, 479 (1969) (use reason and statutory purpose to arrive at proper result).

Thus, a federal district court will consider, just as a well-advised state court would, the statutory language, pertinent legislative history, the statutory scheme set in historical context, how the statute can be woven into the state law with the least distortion of the total fabric, state decisional law, federal cases which construe the state statute, scholarly works and any other reliable data tending to indicate how the New York Court of Appeals would resolve the questions presented. *See Francis v. INA Life Ins. Co.*, 809 F.2d 183, 185 (2d Cir.1987) (federal court may consider all sources used by New York Court of Appeals including decisions of other jurisdictions).

Where a conflict exists between holdings of the Second Circuit and more recent determinations of state appellate courts, this court will follow the outcome it believes the New York Court of Appeals would reach, without giving binding authority to the Second Circuit's construction of the state statute. The federal Court of Appeals is in the same position as a lower state court vis-a-vis the New York Court of Appeals in construing state substantive law under *Erie*. *See* Part VIII *infra*. Adherence to the state decisional authority is constitutionally mandated where

> there appears to be no confusion in the [state] decisions, no developing line of authorities that casts a shadow over the established ones, no dicta, doubts or ambiguities in the opinions of [state] judges on the question, no legislative development that promises to undermine the judicial rule,

*Bernhardt v. Polygraphic Co.*, 350 U.S. 198, 205, 76 S.Ct. 273, 277, 100 L.Ed. 199 (1956).

## V. GENERAL OBLIGATIONS LAW SECTION 15–108

### A. The Statute and Legislative History

Section 15–108 of the New York General Obligations Law sets forth the effect of a settlement with one or more joint tortfeasors on the amount ultimately recovered by a prevailing plaintiff following a verdict against non-settling defendants. It provides:

> (a) Effect of release of or covenant not to sue tortfeasors. When a release or a covenant not to sue or not to enforce a judgment is given to one of two or more persons liable or claimed to be liable in tort for the same injury, or the same wrongful death, it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms expressly so provide, but it reduces the claim of the releasor against the other tortfeasors to the extent of any amount stipuleted [sic] by the release or the covenant, or in the amount of the consideration paid for it, or in the amount of the released tortfeasor's eq-

uitable share of the damages under article fourteen of the civil practice law and rules, whichever is the greatest.

(b) Release of tortfeasor. A release given in good faith by the injured person to one tortfeasor as provided in subdivision (a) relieves him from liability to any other person for contribution as provided in article fourteen of the civil practice law and rules.

(c) Waiver of contribution. A tortfeasor who has obtained his own release from liability shall not be entitled to contribution from any other person.

N.Y. G.O.L. § 15–108.

Article Fourteen of the New York Civil Practice Law and Rules states that "equitable shares shall be determined in accordance with the relative culpability of each person liable for contribution." N.Y. C.P.L.R. § 1402. New York's courts have construed the phrase "the released tortfeasor's equitable share of the damages" to represent the percentage of liability which the jury attributed to that party. *See, e.g., Killeen v. Reinhardt,* 71 A.D.2d 851, 853, 419 N.Y.S.2d 175, 178 (N.Y.App.Div.1979) (referring to "equitable share of the damages as found by the jury"); *Williams v. Niske,* 147 Misc.2d 556, 557 N.Y.S.2d 1006, 1007–09 (N.Y.Sup.Ct.1989) (same). Application of the statute in this case raises several questions concerning the meaning and scope of section 15–108(a).

The New York Court of Appeals decision in *Dole v. Dow Chemical Co.,* 30 N.Y.2d 143, 282 N.E.2d 288, 331 N.Y.S.2d 382 (1972), created the predicate for passage of section 15–108. *Dole* established the rule in New York of apportionment of damages among joint or concurrent tortfeasors regardless of the nature or degree of fault attributable to the different actors. *See Kelly v. Long Island Lighting Co.,* 31 N.Y.2d 25, 29, 334 N.Y.S.2d 851, 854, 286 N.E.2d 241, 242–43 (1972).

Before *Dole* in circumstances such as exist in the Brooklyn Navy Yard cases joint and several liability would have exposed each of the defendants now before the court to full liability to the plaintiffs for all the harm suffered less the total amount actually recovered from all settling defendants. A pre-*Dole* settling defendant had no further responsibility either to the plaintiff or to other non-settling defendants claiming contribution. Green, *General Obligations Law Section 15–108: An Unsettling Law,* 55 N.Y.S.B.J. 28 (1983). A plaintiff who achieved partial settlement with some joint tortfeasors remained free to pursue his or her claim against the non-settling tortfeasors for uncompensated injuries.

After *Dole,* a settling defendant was no longer immune from suits by non-settling defendants for any excess amount the jury apportioned to that particular defendant. By denying a settling defendant the advantage of protection against further litigation, *Dole* created a barrier to settlements.

Since settlements are essential to the operation of a heavily overloaded judicial system, a crisis in adjudicating tort cases loomed. Following extensive study by the Law Revision Commission, at the Commission's suggestion, the legislature enacted section 15–108. The primary concern of the Commission and legislature centered on permitting a plaintiff to settle with one joint tortfeasor without automatically releasing all other tortfeasors. *See, e.g.,* Recommendation of the Law Revision Commission to the Legislature *Relating to the Effect of a General Release Without Reservation Given to One of Two or More Joint Tortfeasors* (Assembly No. 10822; Senate No. 8930) (1972). Emphasis was also placed on not permitting the plaintiff to receive compensation for the same injury in excess of the damage suffered. *Id.*

The 1974 New York Legislative Annual explained that the amendments in section 15–108 were crafted with two principal goals in mind: codification and clarification of the fundamental holding of *Dole* and elimination of the disincentive to settle resulting from interpretations of *Dole.* 1974 N.Y.Legis.Ann. at 15. *See Mielcarek v. Knights,* 50 A.D.2d 122, 126, 375 N.Y.S.2d 922, 925–26 (N.Y.App.Div.1975) ("The 1974 amendment to section 15–108 of the General Obligations Law was enacted to ensure that the non-settling tortfeasor not be bur-

dened with more than his equitable share because of the fact that another tortfeasor had chosen to settle and, at the same time, to rekindle the incentive for settlements....).

An examination of the Law Revision reports and the legislative files available from the Governor's office and elsewhere reveals no reference to the precise issues now before us. Only the general purposes of section 15–108 are discussed.

In *Rock v. Reed–Prentice Division of Package Machinery*, 39 N.Y.2d 34, 40–41, 346 N.E.2d 520, 523, 382 N.Y.S.2d 720, 723 (1976), the Court of Appeals explained that "[t]he general purpose of section 15–108 is to encourage settlements by altering or eliminating certain rules of prior law which had an inhibiting effect on the settlement process." *Id.; see also* N.Y. G.O.L. § 15–108 commentary (purpose of amending section 15–108 was "to encourage settlement in tort cases, something which had become troublesome after the decision in *Dole v. Dow Chemical Co.*"). The statute was designed to foster settlement "by assuring not only that a wrongdoer is responsible for no more than his equitable share of damages, but also that once a defendant settles he purchases an everlasting peace." Green, *General Obligations Law Section 15–108: An Unsettling Law*, 55 N.Y.S.B.J. 28 (1983).

### B. Method of Calculation of G.O.L. § 15–108 Set–Offs

Plaintiffs maintain that the jury in rendering its verdict should consider and apportion fault among all entities potentially responsible for asbestos-related injuries. Once having apportioned fault among all tortfeasors, the plaintiffs assert that the court should calculate the credit due non-settling defendants by 1) adding the value of the settlements and separately 2) adding up the value of the shares attributed to settling defendants. Pursuant to section 15–108, the court then would, following plaintiffs' analysis, deduct the larger of 1) and 2) totals from the verdict owed by non-settling defendants. In contrast, defendants argue that they have the right to calculate the set-offs on a defendant-by-defendant basis, in each instance subtracting the larger of the settlement or value of the share attributed by the jury to each settling defendant. The defendants' version tends to reduce the recovery obtainable from non-settling defendants. In some instances, it will result in those defendants who go to trial having to pay nothing despite a jury verdict that found them liable for a substantial share of the plaintiffs' damages.

An example will suggest the difference. Let us assume defendants A, B and C settle by paying plaintiff $25,000 each. Defendant D goes to trial and the jury fixes total damages at $100,000 and assesses liability as follows: A 60%, B 5%, C 10% and D 25%. Under plaintiffs' version, the total paid in settlements and assessed by the jury against settling defendants is $75,000. This is deducted from the $100,000 and D pays its rightful share, $25,000— 25% of the $100,000 verdict. Under the defendants' version, A is credited with $60,000 (60% × 100,000), B with $25,000, and C with $25,000. This is more than $100,000 so D pays nothing even though the jury found it liable. Plaintiff receives $75,000, which is $25,000 less than the damages awarded by the jury.

If the court were writing on a blank slate, the decision would be easier. The plaintiffs' position appears more closely to fulfill the equitable goals of the statute. It is more consonant with the New York law both before and after *Dole*. It is consistent with the statutory scheme set in historical context and distorts least the total fabric of New York law controlling relations among tort litigants. There is no justification for rewarding recalcitrant non-settling defendants by permitting them to apply the General Obligations Law offset in a manner that reduces or even obliterates their own liability in cases where plaintiffs are not fully compensated for their injuries.

The issue is one with practical implications. Following defendants' view, in *In re Joint Southern & Eastern Dist. Asbestos Litig. (Gallin)*, 760 F.Supp. 33, 34–35 (E.D.N.Y.1991), for example, after set-offs

Owens Illinois was left with no judgment to satisfy despite a jury finding of substantial liability; plaintiff received less than the damage the jury found that he had suffered.

If the set-off were calculated on an aggregate basis as requested by the plaintiffs, non-settling defendants would not be compelled to absorb more than their equitable share of liability and plaintiffs would not obtain a windfall benefit. This method would serve both of the statute's primary goals: to encourage settlements and preserve *Dole*'s equitable fault sharing principles.

The statute itself is ambiguous with respect to how the set-off should be calculated in the context of multiple settling and non-settling defendants. The defendants attribute significance to the statute's reference to the releasing tortfeasor in the singular. In subdivision (a) of section 15–108, it uses the phrase "or in the amount of consideration paid ... or in the amount of *the released tortfeasor's* equitable share of the damages ... whichever is greatest" (emphasis supplied).

At the time the statute was amended in 1972, the paradigm cases cited by the Law Revision Commission were car accidents with two or three defendants. *Cf., e.g., Plath v. Justus,* 28 N.Y.2d 16, 268 N.E.2d 117, 319 N.Y.S.2d 433 (1971); *Livant v. Livant,* 18 A.D.2d 383, 239 N.Y.S.2d 608 (N.Y.App.Div.), *app. dismissed,* 13 N.Y.2d 894, 193 N.E.2d 503, 243 N.Y.S.2d 676 (1963). Enactment preceded the current era of mega-mass tort litigation. Asbestos litigation in particular presents situations not evaluated by the legislature at the time section 15–108 was adopted. The legislature did not consider the typical Brooklyn Navy Yard asbestos case where a plaintiff sues scores of former manufacturers and distributors of asbestos products. Most defendants in such cases settle, leaving only a few defendants who go to trial.

Defendants assert that all New York state courts that have considered the question have permitted the non-settling defendants to proceed with a defendant-by-defendant calculation of set-offs pursuant to General Obligations Law section 15–108. They somewhat overstate the point since many cases have not actually addressed the precise question whether aggregation would better serve the statute's goals. A review of the relevant state decisions does reveal, however, that in at least four state cases verdicts involved more than one settling defendant. In each instance, the court followed a defendant-by-defendant set-off as was requested by defendants. *See Killeen v. Reinhardt,* 71 A.D.2d 851, 419 N.Y.S.2d 175, 177 (N.Y.App.Div.1979); *Williams v. Niske,* 147 Misc.2d 556, 557 N.Y.S.2d 1006, 1009 (N.Y.Sup.Ct.1989); *In re New York City Asbestos Litig.,* 572 N.Y.S.2d 1006 (Sup.Ct.1991) (Freedman, J.); *see also Apple v. Jewish Hosp. & Medical Cent.,* 829 F.2d 326 (2d Cir.1987).

In *Killeen,* the plaintiff had sued several doctors and the hospital for medical malpractice. Before the jury returned a verdict, the plaintiff settled her claims against two doctors for $265,000 and dismissed a third doctor without monetary consideration. The jury found the two physicians who had paid settlements a total of 30% responsible, the physician who was dismissed 20% at fault and the hospital responsible for the remaining 50% of the total $650,000 damages awarded. The trial court reduced the principal amount by the $265,000 received in settlement and additionally by the twenty percent allocated to the doctor against whom the plaintiff discontinued the action. Without discussion of whether the set-offs to account for all settling defendants should be considered in the aggregate or individually, the majority and the concurring judge of the Appellate Division proceeded to calculate the amounts separately. The case was remanded for a new trial for other reasons.

More recently, two learned New York State Supreme Court Justices with extensive experience in mass torts have reviewed the precise question posed here and expressly rejected plaintiffs' construction of the statute. *Williams v. Niske,* 147 Misc.2d 556, 557 N.Y.S.2d 1006, 1009 (N.Y.Sup.Ct.1989) (Gammerman, J.); *In re New York City Asbestos Litig.,* 572

N.Y.S.2d 1006 (Sup.Ct.1991) (Freedman, J.). As the court explained in *Williams:*

> contrary to the plaintiff's argument that [non-settling defendant] BTK must choose with respect to all settling defendants between credit for their equitable liability or the amount paid in settlement, it is clear that the statute imposes no such requirement. The term "tortfeasor" is used in the singular and the non-settling defendant is entitled to credit, with respect to *each* defendant tortfeasor, for the greater of either the amount paid or the equitable liability.

*Williams,* 557 N.Y.S.2d at 1009 (emphasis in original). Moreover, Justice Gammerman emphasized that

> [c]ourts construing the statute have uniformly held that a non-settling defendant against whom a verdict is obtained is entitled to reduce the amount of the recovery against him or her by the full amount of any settlement by other parties, even if the settling party was found to be not liable at all, or by the equitable share of the damages attributable to the settling party, even if that party settled without paying any consideration to the plaintiff.

*Id.* at 1008 (citations omitted). Aware that such a method of calculating set-offs might result in a liable, non-settling defendant being freed of all responsibility for payment despite the fact that a plaintiff had not received full compensation for injuries, Justice Gammerman responded that

> [t]he "free ride" results not solely from the operation of the statute but from the settlements reached by plaintiff with the other defendants.... Plaintiff and his attorney made certain decisions concerning the wisdom of accepting a number of settlement offers. In making those decisions plaintiff's attorney was, or should have been, aware of the provisions of GOL § 15–108, and the impact of those provisions on the amount which the non-settling defendant might be required to pay after jury verdict.

*Id.* at 1009.

Justice Freedman, after reviewing New York practice and the authority discussed above, found the reasoning in *Williams* persuasive and compatible with the statutory scheme. Her decision is highly persuasive since, as already noted, she is responsible for all asbestos cases in the City of New York. It is desirable that the cases tried in the state and federal courts respond to the same substantive rules. Otherwise the plaintiffs will double file their cases and move their trials from state to federal court or vice versa to obtain the benefit of differing interpretations.

The federal courts which have considered the issue also have adopted the defendants' view. Judge Sifton in a multidefendant asbestos case subtracted the settlement amount in the one case in which it exceeded the equitable share allocated by the jury; with respect to each other defendant, he subtracted the amount corresponding to its equitable share of damages as determined by the jury. *In re Joint Eastern & Southern Dists. Asbestos Litig. (Higgins),* 124 F.R.D. 538, 544 (E.D.N.Y.1989), *aff'd sub nom. Johnson v. Celotex Corp.,* 899 F.2d 1281 (2d Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 297, 112 L.Ed.2d 250 (1990). In view of the large compensatory and punitive damages awarded in that case, it appears that plaintiffs did not vigorously press the statutory construction question on appeal before the Second Circuit which did not discuss the particular point.

Judge McLaughlin acting as a district judge reached the same conclusion as did Judge Sifton. *See In re Joint Eastern & Southern Dist. Asbestos Litig. (Gallin),* 760 F.Supp. 33, 34–35 (E.D.N.Y.1991). In that case, Judge McLaughlin calculated the deductions on a defendant-by-defendant basis subtracting the larger amount in each instance. *Id.* at 34 n. 1 (listing offsets).

Other cases, while not directly considering the issue, appear to follow the defendants' method of calculation. In *Werner v. Our Lady of Lourdes,* 60 A.D.2d 791, 400 N.Y.S.2d 659, 660 (N.Y.App.Div.1977), the only issue presented was whether an amount received by a plaintiff from a settling defendant to whom the jury attributed no fault should be subtracted from the damages awarded. The court deter-

mined that the amount was properly deducted from the jury verdict. The question of whether in the context of a multi-defendant case with several settling parties the deductions should be made in the aggregate or individually did not arise.

The Second Circuit has endorsed set-offs that leave non-settling defendants with no verdict to satisfy despite a finding of liability, albeit in a context in which plaintiff received full compensation for her claims. In *Apple v. Jewish Hospital & Medical Center*, 829 F.2d 326 (2d Cir.1987), the representative of an estate of a woman who had died in childbirth brought a wrongful death action for medical malpractice and conscious pain and suffering against an anesthesiologist, Jewish Hospital and the United States. Prior to trial, the plaintiff settled her claims with Jewish Hospital for $600,000 and with the United States for $199,500 and voluntarily discontinued her claim for pain and suffering against those defendants. At trial, the jury awarded the plaintiff $325,000 on her wrongful death claim and $50,000 for her pain and suffering claim. The non-settling defendant, the anesthesiologist, was found 40% responsible for plaintiff's injuries. "Thus, from his total liability of 40 percent of $325,000 or $130,000, plus 40 percent of $50,000, or $20,000, it is obvious that crediting the $799,500 settlement against both causes of action leaves Dr. Aziz owing this plaintiff no damages." *Id.* at 332.

The closest authority in support of the plaintiffs' construction of the statute is an unpublished memorandum opinion by the Second Circuit affirming a district court's molding of verdicts by aggregation. *See Scalone v. Celotex Corp.*, Nos. 90–7064, 90–7138 [923 F.2d 843 (table)] (2d Cir. Oct. 30, 1990). In a limited discussion, the court correctly noted that the equitable apportionment goal of the statute is not served by permitting non-settling defendants to pay less than their share. *Id.* at 4. The Rules of the Second Circuit, however, state that unpublished opinions have no precedential value. Rules of the United States Court of Appeals for the Second Circuit § 0.23 (unpublished decisions are "state-ments [which] do not constitute formal opinions of the court" and "shall not be cited or otherwise used in unrelated cases before this or any other court"). While it might be argued that a recent decision of the Court of Appeals rendered in an asbestos case deserves substantial consideration in a similar case, the opinion provided insufficient analysis to be helpful.

The plaintiffs have forcefully argued that the defendants' construction of the General Obligations Law undermines the settlement goals of the statute. Settlements have always been desirable. In civil cases in particular, voluntary compromise of claims enhances judicial efficiency, affords the parties greater freedom and flexibility in resolving their differences and minimizes enforcement problems. Calculating the set-offs on an aggregate basis would likely better comport with the principles underlying enactment of section 15–108 that sought to encourage settlements. *See Mielcarek v. Knights*, 50 A.D.2d 122, 126, 375 N.Y.S.2d 922, 925 (N.Y.App.Div. 1975); *Rock v. Reed–Prentice Div. of Pkg. Mach.*, 39 N.Y.2d 34, 346 N.E.2d 520, 382 N.Y.S.2d 720 (1976).

Moreover, the court is mindful of the fact that the result in these cases will necessarily be that plaintiffs receive less than full compensation for their injuries. In part plaintiffs assumed this risk when they entered into settlements. At the same time, the court is aware that each settlement was negotiated in good faith after arduous bargaining and with the continuous assistance of the Special Master and the court. These were not collusive settlements designed to shift liability inappropriately.

To force plaintiffs to suffer a shortfall and to exonerate non-settling defendants who have been found liable appears to be a result not intended by the legislature. Nonetheless, the defendants' interpretation of section 15–108 will probably not appreciably inhibit settlements. Verdicts in New York cases tend, on the average, to be much larger than settlements; a defendant's tactic of refusing to settle because of the 15–108 factor would be too danger-

ous. A plaintiff's incentive to settle and to receive a sum promptly and without the burdens and risks of a trial is also strong. Thus, it is unlikely that any interpretation of 15–108 will substantially impede or substantially distort the calculus of settlement. Nevertheless, the weight of decisional law probably creates somewhat of a disincentive to settle contrary to one of its primary purposes. It also probably reduces slightly the value of a case for settlement purposes.

At the moment this court must assume that the New York Court of Appeals would follow the holdings of the lower state courts on this issue. The initial statutory interpretation by the state and federal courts has now developed into an unmistakable jurisprudential trend that this court cannot lightly disregard.

In view of the significance of calculating set-offs for settlements pursuant to the General Obligations Law in civil litigation, this may be an issue appropriate for the Second Circuit to certify to the New York Court of Appeals. *See* N.Y. Rules of Court § 500.17(a) (1991) ("Whenever it appears to the Supreme Court of the United States [or] any United States Court of Appeals ... that determinative questions of New York law are involved in a cause pending before it for which there is no controlling precedent of the Court of Appeals, such court may certify the dispositive questions of law to the Court of Appeals."). In particular, because this is an issue that will recur repeatedly in settlement discussions and at trial, a definitive interpretation would serve the interests of consistent and equitable application of New York law. *See DeWeerth v. Baldinger,* 836 F.2d 103, 108 n. 5 (2d Cir.1987) (procedure recently authorized for certification of state law questions "should be confined to issues likely to recur with some frequency"), *cert. denied,* 486 U.S. 1056, 108 S.Ct. 2823, 100 L.Ed.2d 924 (1988); *Kidney v. Kolmar Laboratories, Inc.,* 808 F.2d 955, 957 (2d Cir.1987). The Second Circuit has stated that the

> purpose of certification is to obtain the benefit of an authoritative construction from the state's highest court before proceeding to the merits of the dispute.

This may further the interests of federal/state comity by providing the state court with the opportunity to rule on an issue of state law before being precluded from doing so by a contrary federal court judgment. The state court's interest in accepting a certified question for review is particularly strong when it has not yet had the opportunity to interpret the pertinent statutory language.

*Dorman v. Satti,* 862 F.2d 432, 434–35 (2d Cir.1988), *cert. denied,* 490 U.S. 1099, 109 S.Ct. 2450, 104 L.Ed.2d 1005 (1989).

Whether or not the question is certified, the subject warrants further legislative study and clarification.

### C. The Manville Personal Injury Settlement Trust

For purposes of the General Obligations Law, the Manville Trust should be treated as a settling defendant in any case where it was not a defendant actually on trial. The Trust was not a defendant at trial in the Phase II and Phase III trials. At the time of these fifteen trials the settlement of the class action involving the Manville Trust had been almost completely resolved and fairness hearings had been held. For all practical purposes these cases had been, and should be deemed to have been, settled *before* trial. By contrast, the sixty-four Phase I cases in which the Trust actually participated as a defendant should be deemed to have been settled *after* trial and the jury verdicts. As indicated below, the timing of the settlement is significant. Since it is unlikely that this problem will arise again, a pragmatic resolution of the Manville Trust allocation is desirable.

#### 1. *Phase II and Phase III Trials*

Neither the Trust nor Manville Corporation is currently in bankruptcy. While virtually insolvent, over time the Trust will pay a substantial percentage of its fair share of damages in accordance with the terms of a class Stipulation of Settlement. *See Findley v. Blinken,* 129 B.R. 710 (E. & S.D.N.Y.1991) (Amended

Memorandum, Order and Final Judgment). Assuming that the Settlement is approved, payments are expected to begin on Level One (serious) claims within the first year and on Level Two (less serious) claims in the third year following entry of a final, nonappealable order.

Treating the Trust as a settling defendant under these circumstances, even though the settlement amounts have not yet been fixed in negotiations between the Trust and plaintiffs, raises the question of how to determine the value of the amount plaintiffs will receive from the Trust in Phase II and III cases in order to calculate the proper credit to allot non-settling defendants. This is another aspect of the equitable allocation of the total damage award that the court must calculate pursuant to General Obligations Law section 15–108. *Cf. In re Joint Eastern & Southern Dist. Asbestos Litig. (Gallin)*, 760 F.Supp. 33, 34–35 (E.D.N.Y.1991) (pursuant to G.O.L. § 15–108, court determines the value of settlement with Manville Trust to be paid over time; accepts face value of settlement rather than discounted value).

The precise amount that each plaintiff will receive from the Trust in settlement cannot be reduced to a sum certain in light of the structure of the class action Settlement. *See In re Joint Eastern & Southern Dists. Asbestos Litig.*, 120 B.R. 648, 670 Appendix C (E. & S.D.N.Y.1990) (Trust Distribution Process, § A: "Predictions of the number of future claims and their severity and of values to be achieved for Trust assets remain difficult to make with precision, so no guaranty of any specific level of payment can be made."). Nevertheless, extensive evidence was introduced in the course of the *Findley* class action proceedings concerning the restructuring of the payment procedures of the Trust to determine the settlement values that the Trust will likely pay for particular diseases. *See* Tr. 1/2/91–1/3/91 & *passim, Findley v. Blinken*, 129 B.R. 710 (E. & S.D.N.Y.1991). The Amended Final Memorandum contained preliminary factual findings that for Level One injuries, defined to

include asbestos-associated malignancies and severe asbestosis causing impairment similar to that attending cancer, the Manville Trust would probably pay, on average, 15% of the total liability for the particular injury. *See Findley v. Blinken*, 129 B.R. 710 (E. & S.D.N.Y.1991) (Part VII.D.4 & Appendix A). For Level Two injuries, including all asbestos-related illnesses not covered by Level One, the Manville Trust would probably pay—if the preliminary analysis is accurate—approximately 7.5% of the total liability. *Id.*

In the Brooklyn Navy Yard cases the jury apportioned between 9–11% of the overall liability to the Johns–Manville Corporation. This roughly corresponds, considering the mixture of Level One and Two claims, with the amounts that plaintiffs may expect to receive from the Trust when discounted to present value to compensate for the time period over which payments will be made in the class action. Applying these figures pursuant to the General Obligations Law, non-settling defendants in Phase II and III cases would be entitled to deduct 15% of the verdict in Level One cases and 7.5% in Level Two cases to account for monies expected to be received by the plaintiffs from the Manville Trust in settlement of their claims against the Trust.

This method differs from that followed by Judge McLaughlin in *Gallin* where the court subtracted the entire face value of the plaintiff's settlement with the Manville Trust ($100,000) while conceding that the Trust's fiscal difficulties made it unlikely that plaintiff would actually receive that sum. *In re Joint Eastern & Southern Dist. Asbestos Litig. (Gallin)*, 760 F.Supp. 33, 34–35 (E.D.N.Y.1991). It also contrasts with the approach endorsed in *McNair v. Owens–Corning Fiberglas Corp.*, 890 F.2d 753, 756–57 (5th Cir.1989), and *Cimino v. Raymark Industries*, 751 F.Supp. 649, 656–57 (E.D.Tex.1990), in which the courts did not reduce plaintiffs' verdicts to account for contingent settlements with the Manville Trust but rather assigned the settlement agreements to non-settling defendants.

At a hearing to finally mold the judgments, held on November 7, 1991, the court, for reasons stated orally on the record, decided *inter alia*: For purposes of New York General Obligations Law § 15–108 plaintiffs have not settled with the Manville Trust. Plaintiffs have voluntarily assigned to defendants whatever rights they possess against the Manville Trust. For purposes of Article 16 of the New York C.P.L.R. in Phase I cases plaintiffs obtained jurisdiction over the Manville Trust, but they could obtain no such jurisdiction in Phases II and III.

### 2. *Phase I Trials*

 Phase I cases present a different problem. The 7.5—15% figures are not relevant to the molding of any verdicts in Phase I of the Brooklyn Navy Yard cases. This is because the Settlement in Manville can be deemed to have occurred *after* the Phase I jury verdicts.

On the point of timing the New York Court of Appeals appears to have spoken plainly. In *Rock v. Reed–Prentice Division of Package Machinery*, 39 N.Y.2d 34, 41, 346 N.E.2d 520, 382 N.Y.S.2d 720, 722 (1976), the court stated flatly that section 15–108 does not apply to settlements *after* judgments:

> The overall scheme and purpose of the section is to promote settlements in multiple-party tort cases by clearly defining the effect the settlement will have on collateral rights and liabilities in future litigation. There is nothing at all to suggest that this statute was ever intended to nullify a pre-existing judgment.

The *Rock* decision should be applied to settlements after verdict as well as after judgments since the verdict has, in effect, fixed the position of the parties. The computations for, and entry of, the final judgment are ministerial. Since the Manville Trust was a party at the trial in Phase I cases, the offsets for Manville for those cases will be the percentage of liability for Manville fixed by the jury.

The Trust is not insolvent at this point. Unlike the jury in the state court Navy Yard trials, the federal jury did not "find reckless behavior within the purview of C.P.L.R. 1602(7)." *In re New York City Asbestos Litigation*, 572 N.Y.S.2d 1006 (Sup.Ct.1991) (Freedman, J.). Thus, joint and several liability does not apply and no indemnification rights are implicated. The amounts the plaintiffs will ultimately receive from the Trust as well as the amounts co-defendants can claim will be fixed in the future pursuant to the Settlement of the class of plaintiffs with the Trust. *See Findley v. Blinken*, 129 B.R. 710 (E. & S.D.N.Y.1991).

### D. Reallocation of Nonparty and Bankrupt Shares

 A separate question with respect to application of section 15–108 concerns the universe of fault sharers among whom responsibility must be apportioned. The General Obligations Law, in contrast with Article 16 of the New York Civil Practice Law and Rules, does not determine whether the verdict should be reduced by the shares of fault attributed to bankrupt or nonparty fault-sharers. Settling defendants will not pay additional sums in any event. N.Y.G.O.L. § 15–108(b).

During trial all parties were afforded wide latitude to introduce evidence to establish who substantially contributed to the alleged injuries or acted or failed to act in a fashion that led to the plaintiffs' injuries. For example, the jury was read the deposition of Harry Brayne, a Navy Yard purchasing agent, who identified seventeen manufacturers which supplied asbestos-containing products to the Navy Yard. The defendants were permitted to argue that the damages were caused at least in part, if not entirely, by other manufacturers not present at trial.

In view of the statutory scheme and the evidence presented, the court concluded that all possible tortfeasors should be included on the verdict sheets. This accords with the practice of both state and federal courts in New York. *See, e.g., In re New York City Asbestos Litig.*, 572 N.Y.S.2d

1006 (Sup.Ct.1991) (Freedman, J.); *Kelly v. Long Island Lighting Co.*, 31 N.Y.2d 25, 29, 334 N.Y.S.2d 851, 854, 286 N.E.2d 241, 242–43 (1972). In *Gannon Personnel Agency v. City of New York*, 57 A.D.2d 538, 394 N.Y.S.2d 5 (N.Y.App.Div.1977), a judgment-proof defendant, Dynasty, defaulted and was severed from the case. Despite the fact that evidence pertaining to its responsibility had been introduced in the course of the trial, the trial judge did not include Dynasty as a potential fault sharer on the verdict sheets. The Appellate Division reversed, holding that after *Kelly* New York law

> provides for a distribution of the loss in proportion to the allocable concurrent fault, thus requiring the attribution to Dynasty of its contribution to the loss. That Dynasty may be judgment proof does not remove the necessity for allocation. The share of the liability of defendants other than Dynasty may well be altered by a failure to assess Dynasty's share of responsibility and thereafter dividing that share among the other defendants in relation to their proportionate shares of the remaining liability.

394 N.Y.S.2d at 8.

*Gannon* demonstrates the benefit of instructing the jury to apportion responsibility among all possible tortfeasors. *See also Garrett v. Holiday Inns, Inc.*, 58 N.Y.2d 253, 258, 447 N.E.2d 717, 719–20, 460 N.Y.S.2d 774, 777 (1983). Allocation among all potential fault sharers is necessary to determine the proper equitable share of settling defendants. That approach was followed in these cases. The question then arises which entities' shares must be redistributed and among whom.

In molding the jury verdicts in accordance with the General Obligations Law, the court must decide how to handle the effect of equitable shares attributed to defendants who were not brought into the litigation either 1) because they have filed petitions for bankruptcy and hence are protected by the automatic stay provision of chapter 11, 11 U.S.C. § 362(a) (1988), or 2) they are nondiverse defendants or 3) jurisdiction could not be obtained for other reasons.

Few New York state or federal cases have addressed this question.

The plaintiffs assert that non-settling defendants should be held jointly and severally liable for the shares of fault attributed to these absent but culpable entities. Defendants argue that the insolvent and non-diverse entities' shares should be redistributed among all culpable parties as determined by the jury, including settling defendants. The language and structure of New York's statutory scheme is persuasive that the New York Court of Appeals would hold non-settling defendants jointly and severally liable for uncollectible shares pursuant to section 15–108.

Section 15–108 provides that deductions may be made under certain circumstances for the greater of the amount received by the plaintiff in settlement or the settlor's equitable share. The statute does not provide for further reductions in plaintiffs' verdicts. It is unlikely that the legislature's silence was inadvertent, especially in light of its subsequent amendments addressing this precise question. *See* N.Y. C.P.L.R. § 1601.

Before the legislature enacted Article 16 of the Civil Practice Law and Rules, New York, like the majority of jurisdictions nationwide, followed the common law rule of joint and several liability. *See, e.g., Gleich v. Volpe*, 32 N.Y.2d 517, 523–24, 300 N.E.2d 148, 346 N.Y.S.2d 806 (1973); *Barrett v. The Third Ave. R.R. Co.*, 45 N.Y. 628 (1871); *see also* Senate Minutes *Re: Senate Bill No. 9391A* at 5149–50 (Statement of Senator Stafford) (listing instances in which joint and several liability *continue* to apply under Article 16); Assembly Minutes (Statement of Rep. Gorski) ("[T]he major thrust of the bill-in-chief ... is to outline certain modifications of the joint and several liability rule for pain and suffering").

Adoption of principles of comparative fault did not alter the common law rule of joint and several liability for concurrent tortfeasors whenever that doctrine was relevant. *See* N.Y.C.P.L.R. § 1404; *Chang v. Stile*, 146 Misc.2d 760, 552 N.Y.S.2d 830, 830–31 (N.Y.Sup.Ct.1990) ("Prior to enact-

ment of Article 16, a plaintiff who had obtained a judgment against more than one joint tort-feasor could proceed to collect the total amount of the judgment from any of the tort-feasors, regardless of the percentage or proportion of negligence ascribable to each...."); *see also Hoerr v. Northfield Foundry & Mach. Co.*, 376 N.W.2d 323, 332 (N.D.1985). The Judicial Conference Report supporting Article 14 explicitly acknowledged the continuing vitality of the joint and several liability doctrine when it stated that "[i]t is not intended that this article change the present rule of joint and several liability among tortfeasors." 1975 Judicial Conference Report *reprinted in* Comments to N.Y.C.P.L.R. § 1404.

As a matter of equity, the General Obligations Law favors fully compensating the plaintiff for losses sustained. *See Hill v. Edmonds*, 26 A.D.2d 554, 270 N.Y.S.2d 1020 (N.Y.App.Div.1966); 1974 Judicial Conference Report *reprinted in* Comments to N.Y.C.P.L.R. § 1404 ("The function of subdivision (a) of this section is to assure that this Article is interpreted consistently with the views of the Court of Appeals ... to the end that the traditional doctrine of joint and several liability among multiple wrongdoers ... is not changed by operation of this Article.").

The principles of joint and several liability were preserved by the revival statute covering previously time barred claims. When the New York legislature enacted its tort reform provisions in 1986, it explicitly created a "window" period during which plaintiffs with causes of action previously time-barred could file "revived" actions.

§ 4. Notwithstanding any other provision of law ..., every action for personal injury, injury to property or death caused by the latent effects of exposure to ... asbestos ... which is barred as of the effective date of this act or which was dismissed prior to the effective date of this act solely because the applicable period of limitations has or had expired is hereby revived and an action thereon may be commenced provided such action is commenced within one year from the effective date of this act....

McKinney's 1986 Session Laws of New York, ch. 682, § 4, at 1567 (uncodified). At the time the revival statute was enacted the legislature realized that the statute could be applied to asbestos exposure dating back to the early part of this century. *See Monte v. National Gypsum Co.*, 921 F.2d 405, 408 (2d Cir.1990). Actions revived pursuant to this section were explicitly exempted from the strictures of Article 16 limiting the liability of persons jointly responsible for causing injury. *See* McKinney's 1986 Session Laws of New York, ch. 682, § 12, at 1574 (uncodified).

State Supreme Court Justice Helen E. Freedman took a different position in reliance upon *Austin v. Raymark Industries*, 841 F.2d 1184, 1195–96 (1st Cir.1988). She tentatively concluded that bankrupts' shares should be reapportioned among both settling and non-settling defendants in relative proportion to their fault. *See In re New York City Asbestos Litig.*, 572 N.Y.S.2d 1006 (Sup.Ct.1991) (Freedman, J.). *Austin* relied upon Maine law. The plaintiff sued a number of asbestos manufacturers for the wrongful death of her husband. Prior to trial, she settled her claims against all defendants except Unarco Industries and Raymark Industries, signing so-called *Pierringer* releases with several defendants. These releases indemnify the settling defendants and include the following language:

Releasor [the plaintiff] also agrees to satisfy any future judgment that may be rendered in favor of the Releasor, in such fraction, portion or percentage of the judgment as the causal fault of the Releasee is adjudged to be of all causal fault of all persons adjudged liable to Releasor.

*Austin,* 841 F.2d at 1191. Some courts have construed this language to mean that the plaintiff agreed to satisfy that portion of any judgment attributed to the settling party above the amount received in settlement. *Id.*

No such arrangement is necessary in New York since the General Obligations Law explicitly releases settling defendants from contribution claims. N.Y.G.O.L.

§ 15-108(b). The settling defendants in the Brooklyn Navy Yard asbestos cases did not obtain a *Pierringer* release.

The court in *Austin* was construing a statutory scheme with significant differences from New York's. *See, e.g., Austin,* 841 F.2d at 1188 (no reduction in verdict for amounts received by plaintiff from defendants found not to be at fault). Moreover, the *Austin* court readily admitted the weight of authority in support of holding non-settling defendants jointly and severally responsible for shares attributed to insolvent tortfeasors. *Id.* at 1195-96.

Several other states which have considered the question have found that it is equitable to reallocate shares attributed to insolvent parties among non-settling defendants. *See, e.g., Hoerr v. Northfield Foundry & Mach. Co.,* 376 N.W.2d 323, 332 (N.D.1985); *Chart v. General Motors Corp.,* 80 Wis.2d 91, 258 N.W.2d 680, 687 (Wis.1977). In *Chart,* General Motors, a solvent defendant, argued that the share attributable and uncollectible from an insolvent defendant ought to be borne in part by the plaintiff who had executed a *Pierringer* release, in effect indemnifying the non-settling defendant. The court rejected the argument because

> there exists no rule requiring solvent, non-settling tort-feasors to equitably share that part of a judgment which is uncollectible from an insolvent, non-settling tort-feasor. We decline to consider such a rule here.

*Id.* 258 N.W.2d at 687; *see also Paradise Valley Hosp. v. Schlossman,* 191 Cal.Rptr. 531, 535, 143 Cal.App.3d 87, 92 (Cal.Ct.App. 1983) ("Under joint and several liability with contribution, the solvent defendant(s) would pay the proportion of damages attributable to the insolvent tortfeasor *because each defendant is liable for the whole injury.*") (emphasis in original) (citation omitted).

Other jurisdictions considering this question have similarly concluded that the shares attributed to insolvent or otherwise unavailable parties must be absorbed by non-settling defendants. In *Hoerr v. Northfield Foundry & Machinery Co.,* 376 N.W.2d 323, 330-33 (N.D.1985), the court held non-settling defendants jointly and severally liable for shares of fault attributed by the jury to the plaintiff's employer, who was statutorily immune to suit, and those attributed to an insolvent defendant. Although plaintiff had entered into a release similar to the *Pierringer* one, the court found that the plaintiff only assumed responsibility for shares directly allocated to that settling defendant.

> [T]he plaintiff does not impliedly agree, or expect as a natural consequence of entering into a settlement, that he or she will be forced to absorb portions of causal fault attributable to nonsettling tortfeasors who are either insolvent or statutorily immune from suit.

*Id.* at 332; *see also Ambriz v. Kress,* 196 Cal.Rptr. 417, 420-22, 148 Cal.App.3d 963, 968-71 (Cal.Ct.App.1983) ("An insolvent defendant's shortfall should be shared proportionately by the solvent defendants as though the insolvent or absent person had originally not participated.").

The majority method of computation, as already noted, preserves the non-settlors' equitable rights to contribution from the bankrupt entities if and when they emerge from reorganization proceedings. *See Simpson v. Pittsburgh Corning Corp.,* 901 F.2d 277, 284 (2d Cir.) (non-settling defendant can sue for contribution from Manville following bankruptcy), *cert. denied,* —— U.S. ——, 111 S.Ct. 27, 111 L.Ed.2d 840 (1990); *cf.* Accounting and Financial Statements of Manville Personal Injury Settlement Trust for Period Ending June 30, 1991 filed and docketed in *Findley v. Blinken,* 129 B.R. 710 (E. & S.D.N.Y.1991) (over 14 million dollars paid in codefendant liquidated claims since consummation of bankruptcy plan).

Some jurisdictions have reached a contrary result relying on statutory provisions or forms of releases that differ from those in effect in New York. In *Hosley v. Armstrong Cork Co.,* 383 N.W.2d 289, 290-94 (Minn.1986), the court as a matter of equity reapportioned a bankrupt party's share among the non-settling defendant and settling defendants found more causally re-

sponsible than the plaintiff. It relied in large part on the language of the release signed by the plaintiff and Minnesota's reallocation statute. *See* Minn.Stat. § 604.-02(2) ("the court shall determine whether all or part of a party's equitable share of the obligation is uncollectible from that party and shall reallocate any uncollectible amount among the other parties, including a claimant at fault, according to their respective percentages of fault"). No such provision exists in New York. Moreover, the Minnesota Supreme Court stated:

> There appear to be no public policy considerations that would prevent us from enforcing the reallocation clause in the *Pierringer* [*v. Hoger*, 21 Wis.2d 182, 124 N.W.2d 106 (1963)] releases. In bargaining for a settlement with some of the defendants, both Hosley and the other defendants were aware of the petitions for reorganization filed by two of the defendants named in the complaint, Johns–Manville and Unarco. Thus, the consequence of agreeing to such a clause in the *Pierringer* releases must have been understood by both parties.

*Hosley*, 383 N.W.2d at 294.

The only other authority offered by the defendants involved a factual situation that differs significantly from that presented here. *In re Joint Eastern & Southern Dists. Asbestos Litig. (Higgins)*, 124 F.R.D. 538, 542–43 (E.D.N.Y.1989) (Celotex filed for bankruptcy after the verdict; the issue of reallocating the bankrupt's share was not discussed), *aff'd sub nom. Johnson v. Celotex Corp.*, 899 F.2d 1281 (2d Cir.), *cert. denied*, — U.S. ——, 111 S.Ct. 297, 112 L.Ed.2d 250 (1990).

In sum, the shares attributable to bankrupts and others who could not be made parties should be allocated only among the non-settling defendants. *Cf. McNair v. Owens–Corning Fiberglas Corp.*, 890 F.2d 753, 756–57 (5th Cir.1989) (non-settling defendant jointly and severally liable for insolvent's share). This result accords with both the New York statutes and equity. Although this holding diverges from that of Justice Freedman, it is unlikely to lead to forum shopping. In addition, since this holding applies only to actions filed prior to July 30, 1987, no forum changes are likely in pending cases.

As already indicated in Part V.A & B, *supra*, the plaintiff absorbs any loss resulting from an extra share attributed to settling defendants. In view of the insolvency of several former manufacturers of asbestos products, joint and several liability will enhance the possibility that a plaintiff will obtain judgments closer to full recovery. The non-settling wrongdoers may subsequently determine the proper distribution of loss among themselves. *See* N.Y.C.P.L.R. § 1401. Thus, for example, when a bankrupt makes payments upon being discharged in bankruptcy, the non-settling defendant which paid more than its share may seek reimbursement from the bankrupt's funds. *See Simpson v. Pittsburgh Corning Corp.*, 901 F.2d 277, 284 (2d Cir.) (Pittsburgh Corning, a non-settling defendant, still retains the right to pursue Manville Trust, unavailable due to bankruptcy at time of trial, for contribution), *cert. denied*, 111 S.Ct. 27 (1990).

The share attributed in revived cases to companies now in bankruptcy shall be redistributed in proportion to their fault among solvent non-settling defendants. The application of New York's General Obligations Law provisions to this problem will not pose significant liability in the future since decreasing numbers of pending cases fall within the revival statute.

## VI. ACTIONS SUBJECT TO ARTICLE 16 OF NEW YORK CIVIL PRACTICE LAW AND RULES

The New York Toxic Tort Reform Act of 1986 provided for a date of discovery statute of limitations rule in exposure to toxic substances such as asbestos. N.Y.C.P.L.R. § 214–c; McKinney's 1986 Session Laws of New York, ch. 682, § 4 (uncodified). In response to recommendations proffered by the Governor's Advisory Commission on Liability Insurance, the legislature at the same time enacted modifications that limited the liability for non-economic damages of joint tortfeasors found fifty percent or less responsible for a par-

ticular injury. *See* McKinney's 1986 Session Laws, Vol. 2, at 3182–83; N.Y.C.P.L.R. § 1601. The reach of Article 16 becomes relevant in these cases because the jury attributed less than fifty percent responsibility to each tortfeasor in the Brooklyn Navy Yard cases.

Section 1601 of the New York Civil Practice Law and Rules reads in pertinent part:

1. Notwithstanding any other provision of law, when a verdict or decision in an action or claim for personal injury is determined in favor of a claimant in an action involving two or more tortfeasors jointly liable or in a claim against the state and the liability of a defendant is found to be fifty percent or less of the total liability assigned to all persons liable, the liability of such defendant to the claimant for non-economic loss shall not exceed that defendant's equitable share determined in accordance with the relative culpability of each person causing or contributing to the total liability for non-economic loss; provided, however that *the culpable conduct of any person not a party to the action shall not be considered in determining any equitable share herein* if the claimant proves that with due diligence he was unable to obtain jurisdiction over such person in said action (or in a claim against the state, in a court of this state).

2. Nothing in this section shall be construed to affect or impair any right of a tortfeasor under section 15–108 of the general obligations law.

N.Y.C.P.L.R. § 1601 (emphasis supplied).

Section 1601 is subject to numerous exceptions. *See* N.Y.C.P.L.R. § 1602 (enumerating eleven exceptions). A principal one excludes from the calculation parties whom the plaintiff proves that with due diligence he or she could not obtain jurisdiction over "in said action." The plaintiffs contend that this exemption applies to both the bankrupt entities and parties over whom the plaintiffs could not obtain subject matter jurisdiction because it would destroy diversity among the parties.

The defendants assert that neither category of nonparties ought to be excluded from Article 16. They argue that the statute was drafted to prevent deep pockets from absorbing disproportionate shares of fault. In their view, federal courts have jurisdiction over parties in bankruptcy and culpable parties who reside in the same state as the plaintiff are subject to suit in state court for the injuries they have caused. Hence these shares should be included for Article 16 purposes.

While not yet addressed by any state or federal court in New York, the plain language of the statute excludes shares attributed to bankrupt parties. The legislative intent "to limit the liability of certain defendants for non-economic loss, such as pain and suffering and mental anguish," Governor's Memorandum, McKinney's 1986 Session Laws of New York, Volume 2 at 3182–83, is not unlimited. By excluding parties over whom the plaintiff could not reasonably obtain jurisdiction, the legislature balanced the desire to limit liability of partially culpable entities with the interests of plaintiffs in receiving adequate compensation for injuries. It is both unfair and contrary to the statutory scheme to place the shortfall in compensation resulting from the bankruptcies of several former manufacturers of asbestos-containing products on plaintiffs in view of this explicit statutory language. *Cf.* Governor's Memorandum, *Re: Senate 9391–A*, at 4 (July 21, 1986) ("The changes made were carefully drafted to avoid unduly harsh results. They represent a fair compromise of the many diverse interests of the groups and individuals who have considered and expressed their views on the current state of tort law and the insurance industry.").

As a technical matter entities which have filed petitions for bankruptcy are subject to suit, but the automatic stay precludes processing a claim against them. 11 U.S.C. § 362(a) (1988). No amount of diligence could result in the plaintiff bringing bankrupt parties into this litigation; hence it does not appear that their share should be considered pursuant to Article 16. *See Zakshevsky v. City of New York*, 149 Misc.2d 52, 562 N.Y.S.2d 371, 372 (N.Y.Sup. Ct.1990) (finding that Article 16 applies be-

cause "[t]he court, as a matter of law, determines that there is no valid reason why the plaintiff could not have obtained jurisdiction over [nonparty]"). As already pointed out, non-settling defendants preserve their claims for contribution against parties currently protected by a Chapter 11 stay. Plaintiffs should not have to file successive actions to obtain compensation for a single injury.

The question with respect to shares attributed to nondiverse defendants is more difficult. Jurisdiction over such parties is available in the state courts, and to create a difference in substantive law turning on the court the plaintiff chooses does encourage forum shopping. Only one court appears to have addressed this question. In a thoughtful analysis, Judge Pierre Leval rejected the defendants' construction of the statute and found that nondiverse defendants' shares are not within the Article 16 calculation. *In re Joint Eastern & Southern Dists. Asbestos Litig. (Dutcher)*, 1990 WL 124330, No. 88–1286 slip op. at 5–10 (1990). Emphasizing that the statute represents a legislative compromise with some aspects that favor plaintiffs and others that favor defendants, the court stated:

> Because this court's subject matter jurisdiction depends on the diversity of the parties, plaintiffs cannot obtain jurisdiction 'in said action' of potential defendants who are citizens of the same state as plaintiffs. Joining them as defendants would require dismissal of the action.

*Id.* slip op. at 8.

Judge Leval found that a careful reading of the statutory language supports the plaintiffs' interpretation with respect to nondiverse defendants. The limitation to persons over whom jurisdiction was obtainable with due diligence "in said action" given its natural and ordinary meaning refers to the ability of the plaintiff to bring the party into the particular case, without regard to the fact that the party might have sued in another court and obtained jurisdiction. In addition, that clause is followed by a parenthetical that excludes cases brought against the state of New York. Since suits against the state must be prosecuted in the Court of Claims where claims against other tortfeasors cannot be joined, this exception permits the state to take advantage of Article 16. As Judge Leval concludes:

> If the statute meant what the defendants contend, this parenthetical language would be superfluous. All it provides is what defendants contend the statute already provides—that the limitation of liability operates with respect to the acts of any tortfeasor who could be sued in a court of New York State, regardless whether it could be sued in the same court as the defendant.
>
> The inclusion of the parenthetical prefaced by the word "or" clearly shows that the parenthetical was intended as an exception to what would otherwise be the rule. This reinforces the plaintiffs' argument that when the statute spoke of ability to obtain jurisdiction "in said action," it meant exactly that.

*Id.* at 9.

Had the legislature sought to protect defendants sued in federal court pursuant to diversity jurisdiction, it could easily have done so. The legislature chose to afford plaintiffs the opportunity to receive full recovery even if suit is brought in federal court in a single action to avoid the need for multiple litigations of personal injury claims. *Id.* at 10. Judge Leval's conclusions are adopted.

In calculating shares for purposes of Article 16, percentages of fault attributed by the jury to nondiverse and bankrupt parties over whom the plaintiffs could not with due diligence have obtained jurisdiction in the federal court, including parties in bankruptcy and nondiverse defendants, are excluded.

## VII. FLINTKOTE

In the case of one defendant, Flintkote, the court dismissed plaintiffs' claims on the ground that no case had been proven against this defendant at trial. Nevertheless, the jury apportioned a small percentage of fault against this defendant. In this respect, the jury's verdict must be set

aside as without warrant. The Flintkote share should thus be reallocated among all culpable parties. This is a correction for an error of the jury.

## VIII. VERNON GREEN: A TWO–INJURY CASE

On July 13, 1987, plaintiff Vernon Green filed a "revival statute" action to recover damages for personal injuries allegedly caused by his occupational exposure to asbestos. At the time, the plaintiff sought damages for asbestosis. Some time in late 1990 or early 1991, Mr. Green was diagnosed as having mesothelioma, a rare fatal type of cancer. Plaintiff thereafter sought recovery for both his initial injury, asbestosis, and his second injury, mesothelioma.

Mr. Green's initial claim, filed within the one year window provided for in the revival statute, was not subject to the other provisions of the 1986 tort reform legislation. McKinney's 1986 Sessions Laws of New York, ch. 682, § 12, at 1574. If Mr. Green is permitted by law to assert a second injury, the parties dispute what law should govern the second claim.

Plaintiff's counsel asserts that damages awarded for Mr. Green's mesothelioma injury should "relate back" to the time his first personal injury claim was filed and hence should fall within the old statutory scheme. Defendants argue that Mr. Green's mesothelioma is a second and distinct injury for which a separate cause of action arose governed by Article 16 of the Civil Practice Law and Rules. *See* N.Y.C.P.L.R. § 214–c.

State Supreme Court Justice Helen E. Freedman in a well-reasoned opinion concluded that New York is a "second injury" jurisdiction in which a plaintiff may file a new claim based on a separate and distinct injury which develops subsequent to the filing of the initial claim. *Fusaro v. Porter–Hayden Co.*, 145 Misc.2d 911, 548 N.Y.S.2d 856 (N.Y.Sup.Ct.1989), *aff'd without opinion*, 170 A.D.2d 239, 565 N.Y.S.2d 357 (1991). In *Fusaro*, the plaintiff also filed a personal injury claim during the window period seeking compensation for

asbestosis. *Id.* 548 N.Y.S.2d at 857. In November of 1987, the plaintiff was diagnosed as having mesothelioma. Following the plaintiff's death in 1988, his administratrix filed an amended complaint which included a claim for damages resulting from the mesothelioma. Defendants sought to dismiss the amended complaint on the grounds that it did not fall within the one year revival period. *See* McKinney's 1986 Session Laws of New York, ch. 682, § 4. Plaintiffs responded that mesothelioma was a separate and distinct injury and that the new claim was filed within the limitations period contained in the "discovery rule." N.Y.C.P.L.R. § 214–c (actions may be commenced within three years of discovery of injury).

The court held that the claim was timely, finding "[w]hile asbestosis and mesothelioma are both causally connected to asbestos fiber exposure, almost every other aspect of the diseases [is] different." *Id.* at 859. Justice Freedman found the ruling consistent with the New York decisional law and tort reform legislation.

> It is precisely because courts have rejected claims by asbestosis victims for increased risk of cancer on the ground that they are too speculative that the right to recover independently should a second injury develop has been recognized in other jurisdictions....
>
> It would be unfair to prohibit claims for increased risk of cancer for asbestosis sufferers and at the same time, hold that failure to bring a suit against any or all defendants when a plaintiff is suffering from asbestosis acts as a time bar to a future cancer claim. To ameliorate that potential unfairness, it has been held that "the time to commence litigation does not begin to run on a separate and distinct disease until that disease becomes manifest."

*Fusaro*, 548 N.Y.S.2d at 860 (quoting *Fearson v. Johns–Manville Sales Corp.*, 525 F.Supp. 671 (D.D.C.1981)).

The date of discovery rule was enacted to afford plaintiffs the opportunity to recover in cases of exposure to toxic substances where the hazardous effect may not manifest itself for a long period of

time. Subsection 6 of § 214–c sets forth an exception:

> This section shall be applicable to acts, omissions or failures occurring prior to, on or after July first, nineteen hundred eighty-six, except that this section shall not be applicable to any act, omission or failure:
>
> (a) which occurred prior to July first, nineteen hundred eighty-six, and
>
> (b) which caused or contributed to an injury that either was discovered or through the exercise of reasonable diligence should have been discovered prior to such date, and
>
> (c) an action for which was or would have been barred because the applicable period of limitations had expired prior to such date.

N.Y.C.P.L.R. § 214–c(6). Mr. Green satisfies the first criterion. With respect to the second factor, Justice Freedman concluded that

> [t]o define injury in subsection (6)(b) as "any injury" would negate this salutary purpose. Instead, the word "injury" in paragraph (b) should be equated with physical manifestation of the particular disease for which compensation is sought.

548 N.Y.S.2d at 858 (citation omitted).

The jury awarded Mr. Green $1,016,000. Neither claim was time barred. The asbestosis injury fell within the statute of limitations provided for in the revival statute and the mesothelioma injury was filed within three years of its manifestation and diagnosis. This result is consistent with the recent Second Circuit case, *Kulzer v. Pittsburgh Corning Corp.*, 942 F.2d 122 (2d Cir.1991) (claim not time barred under N.Y.E.P.T.L. § 5–4.3 not eligible for revival).

▪ The verdict form on behalf of Mr. Green was prepared by the plaintiffs without objection from defendants. It included a single inquiry: "[w]hat damages, if any, did Vernon Green sustain from exposure to products containing asbestos when he worked at the shipyard?" It is impossible to determine what portion was intended to compensate Mr. Green for his asbestosis and what amount for the mesothelioma.

In all instances, the jury in the Brooklyn Navy Yard cases awarded the largest sums in mesothelioma cases, a disease far more serious than asbestosis. In view of the evidence in this case, the asbestosis portion of the award can be considered *de minimis*. The entire award in this instance will be considered compensation for Mr. Green's second, more serious cancer injury. The verdict should be molded in conformity with tort reform cases.

## IX. INTEREST PURSUANT TO NEW YORK ESTATE, POWERS AND TRUST LAW SECTION 5–4.3

### A. Non-settling Defendants

▪ New York Estate, Powers and Trust Law sets forth the basic principles for award of damages in wrongful death actions in New York. With respect to interest, it reads:

> Interest upon the principal sum recovered by the plaintiff from the date of the decedent's death shall be added to and be a part of the total sum awarded.

N.Y.E.P.T.L. § 5–4.3(a). The statute explicitly provides for recovery "for the pecuniary injuries resulting from the decedent's death." Courts interpreting the provision have differed on whether the provision authorizes interest only on losses suffered between the date of death and the entry of judgment or on all losses awarded to the plaintiff. *Compare Schmertz v. Matteo*, 148 Misc.2d 491, 560 N.Y.S.2d 591 (N.Y.Sup.Ct.1990), *aff'd*, 171 A.D.2d 602, 567 N.Y.S.2d 691 (1991) *with Woodling v. Garrett Corp.*, 813 F.2d 543 (2d Cir.1987).

The Second Circuit Court of Appeals was the first court to define the interest recoverable pursuant to section 5–4.3. In *Shu-Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 51–52 (2d Cir.1984), the court concluded that the plaintiff was not entitled to prejudgment interest on post-judgment losses, explaining that

> [t]he purpose of the [wrongful death] statute is to compensate for " 'pecuniary

losses' suffered by the distributees of the decedent's estate." *Parilis v. Feinstein,* 49 N.Y.2d 984, 985, 429 N.Y.S.2d 165, 406 N.E.2d 1059 (1980). The prejudgment interest provision implements this goal by ensuring that the distributees are compensated for the time value of the income stream the decedent would have earned between death and the entry of judgment.... Were prejudgment interest applied to the component of the award intended to compensate the plaintiff for postjudgment losses, plaintiffs would effectively receive a double recovery.

*Id.* at 51–52. Without any apparent basis upon which to award such a windfall, the court held that interest was available on prejudgment losses only.

In a more recent case, the Second Circuit faced with the same question adhered to its earlier holding despite an interim state decision reaching the opposite conclusion. *Woodling v. Garrett Corp.,* 813 F.2d 543, 559–60 (2d Cir.1987). The court admitted: "[although] we are uncertain of the correctness of the fundamental assumption of *Lin,* we conclude that since the facts here matched that assumption the *Lin* holding should have been applied in the present case." *Id.* at 559. The assumption was that when a jury is instructed to discount an award for future losses to present value to account for the earning potential of that money, it does so to the date of decision, not the date of death. If future damages are discounted back to the date of death, then prejudgment interest on the entire award from the date of death is necessary to compensate the plaintiff fully for the loss incurred. The *Woodling* court appeared to find the method of discounting determinative of the interest obtainable under the statute to ensure that the plaintiff does not receive a double recovery as a result of discounting and interest. *Id.* at 559–60.

Several state cases in contrast have construed the statute to provide for prejudgment interest on the entire wrongful death award. In an early case, the Third Department affirmed a trial judge's award of interest in a wrongful death case calculated upon the entire sum of the jury verdict. *Soulier v. Hughes,* 119 A.D.2d 951, 501 N.Y.S.2d 480, 482–83 (N.Y.App.Div.1986). In part the court refused to disturb the award because the defendants had failed to make timely objections. The *Soulier* court also stated that the statute made no distinction between present and future losses and that to the extent *Lin* suggested otherwise, the court "decline[d] to adopt its reasoning." *Id.*

More recently Justice Gammerman in a well-reasoned opinion concluded that prejudgment interest from the date of decedent's death is required on all sums awarded in cases pursuant to New York Estate, Powers and Trust Law section 5–4.3. *Schmertz v. Matteo,* 148 Misc.2d 491, 560 N.Y.S.2d 591 (N.Y.Sup.Ct.1990). He found this construction consistent with the language of the statute and prior practice in New York. 560 N.Y.S.2d at 592. Moreover, the legislature recently returned to the statute and amended New York Civil Practice Law and Rules section 4111(f) to provide for itemized verdicts which separate past and future damages. The exact provision was modified—as part of the "Medical And Dental Malpractice And Professional Act" of 1986—with respect to instructions for the jury concerning a decedent's income tax obligations without altering other aspects of the section. This provision is applicable to all actions in which trial had not begun as of August 1, 1988, including the Brooklyn Navy Yard cases. Justice Gammerman concluded:

It cannot be presumed that the failure of the legislature to make such a change was inadvertent. The enactment of CPLR 4111(f) made it possible to distinguish between past and future damages so that were it the intention of the legislature to limit the applicability of EPTL Section 5–4.3 only to damages up to the date of trial such amendment could have been effected.

*Id.* at 593.

In a memorandum decision, the Appellate Division affirmed Justice Gammerman's decision. *Schmertz v. Presbyterian Hospital,* 171 A.D.2d 602, 567 N.Y.S.2d 691 (1991). The court found the statutory lan-

guage clear and explicitly disavowed the contrary interpretation of the Second Circuit.

In this wrongful death action, it is undisputed that much of the recovery for wrongful death was attributable to losses not yet sustained on the judgment date. Defendant Presbyterian Hospital maintains that no pre-judgment interest should have been awarded on such future damages, despite the unequivocal language of EPTL § 5–4.3.

The Supreme Court properly rejected this argument. EPTL § 5–4.3 "provides for interest on the 'principal sum recovered' without distinguishing between pre-judgment and postjudgment losses of future income." (*Soulier v. Hughes,* 119 A.D.2d 951, 954, 501 N.Y.S.2d 480; and see, *Milbrandt v. A.P. Green Refactories Co.,* App.Div., 562 N.Y.S.2d 252). In light of the clear and unambiguous language of the statute, we note, but decline to follow, the contrary view expressed by the United States Court of Appeals in *Woodling v. Garrett Corp.,* 813 F.2d 543[·]. We further note that the jury, in the instant case, was presented with the testimony of an economist who discounted the value of damages to their present value.

*Schmertz v. Presbyterian Hospital,* 171 A.D.2d 602, 567 N.Y.S.2d 691 (1991).

Justice Helen E. Freedman similarly concluded that interest must be awarded on the entire verdict in her Brooklyn Navy Yard wrongful death actions. *In re New York City Asbestos Litig.,* 572 N.Y.S.2d 1006 (Sup.Ct.1991) (Freedman, J.). She noted "[i]n view of the prevailing state law, the Court declines to follow *Woodling v. Garrett Corp.,* 813 F.2d 543 (2d Cir.1987)." *Id.*

■ The question that flows from *Erie* with respect to this provision arises because of the clear conflict between holdings of the Second Circuit and those of the state courts, including the highest state appellate courts which have considered the matter. The opinions of a federal court of appeals do not bind a federal district court

acting in a diversity case after the appellate court's interpretations have been repeatedly rejected by subsequent decisions of state trial and appellate courts. *Cf. Puckett v. Tennessee Eastman Co.,* 889 F.2d 1481, 1485 (6th Cir.1989) (district court could not ignore decision of state appellate courts on point, despite previous federal district court holding to contrary). State court decisions rendered by lower courts should be accorded proper regard and are considered strong evidence of the meaning of state law.

As Professor Wright reminds us, "it is never too late to change in conformity to some new pronouncement of state law." C. Wright, *The Law of Federal Courts* § 58, at 372 (4th ed. 1983). Even where a federal court of appeals has addressed the question, subsequent state court decisions cannot be ignored. *Cf. Abex Corp. v. Maryland Cas. Co.,* 790 F.2d 119, 126 n. 30 (D.C.Cir.1986) (will consider state court decisions handed down *after* circuit court decision in question). "[T]he *Erie* doctrine does not foreclose the federal court's capability to consider continuing developments in legal principles when determining questions of state law." *Patrick v. Sharon Steel Corp.,* 549 F.Supp. 1259, 1263 (N.D.W.Va.1982); *see ,also Florom v. Elliott Mfg.,* 867 F.2d 570 (10th Cir.1989) (relying on dicta in state intermediate court decision rather than previous federal district court holding).

Defendants have conceded that a decision by the Second Circuit is not binding on this court in determining a question of state law. *See* Brief for Defendant Owens–Illinois, Inc. and Keene Corp. In Opposition To Certain Plaintiffs' Requests Regarding Molding Of Judgments at 18 n. 28 (May 3, 1991) ("[E]ven if the Second Circuit had published *Scalone,* it would merely be a non-dispositive federal court opinion on an issue of state law. In diversity cases (like *Scalone* and these cases) the federal court is, of course, obligated to follow both the statutory and decisional state law.").

It does, as the Second Circuit suggests, appear counter-intuitive to award interest on damages yet to occur. At the same

time, the statutory scheme taken as a whole limits plaintiffs' recovery in some ways and allows added compensation in other respects. In such statutory compromises some irrationality is to be expected in order to achieve legislative consensus. Based on present ruling state law, it appears likely that the New York Court of Appeals will follow the state court precedents on this question. The issue may well be bound for the New York Court of Appeals in an appeal currently pending from *Schmertz.* In any event, the issue can be certified by the federal Court of Appeals for resolution by the New York Court of Appeals. *See* Part V.B, *supra.*

The plaintiffs are entitled to prejudgment interest on the entire sums awarded. Interest should be calculated at the statutory rate of nine percent as provided in New York Civil Practice Law and Rules section 5004.

### B. The Manville Trust

■ Pursuant to the terms of the Second Amended and Restated Plan of Reorganization, no interest will be assessed against the Manville Personal Injury Settlement Trust. Section 3.4 of the Plan expressly provides that no amounts will be paid from the Trust for either interest or punitive damages on personal injury asbestos claims. The Plan was confirmed and upheld on appeal. *In re Johns–Manville Corp.,* 68 B.R. 618 (Bankr.S.D.N.Y.1986), *aff'd,* 78 Bankr. 407 (S.D.N.Y.1987), *aff'd,* 843 F.2d 636 (2d Cir.1988). The Bankruptcy Code states that "the provisions of a confirmed plan bind the debtor ... and any creditor." 11 U.S.C. § 1141(a) (1988). This provision is applicable to the states under the Supremacy Clause. *In re George,* 844 F.2d 1562, 1565 (11th Cir.1988), *cert. denied,* 488 U.S. 1034, 109 S.Ct. 850, 102 L.Ed.2d 981 (1989). The wisdom of this provision of the Plan is amply demonstrated by the Trust's recent fiscal crisis and its need to restructure its payment provisions to conserve funds. Judgments against the Manville Trust are stayed pursuant to the injunction issued as part of the Amended Memorandum, Order and Final Judgment in a nationwide class action. *Findley v.*

*Blinken,* 129 B.R. 710 (E. & S.D.N.Y.1991). No interest will be awarded against the Trust.

### X. COLLATERAL SOURCE PAYMENTS

Pursuant to Civil Practice Law and Rules section 4545(c), effective June 28, 1986, the court is required to deduct from any damages awarded amounts for which the plaintiff may have previously received or with reasonable certainty will receive in the future reimbursement from a collateral source. The statute provides that in actions for personal injury, injury to property or wrongful death in which a "plaintiff seeks to recover for the [past or future] cost of medical care [or other specified care or services], loss of earnings or other economic loss," the court shall reduce the award by the amount the court finds will be "replaced or indemnified, in whole or in part, from any collateral source such as insurance...." N.Y.C.P.L.R. § 4545(c). In these cases, the category covered by this statute primarily involves insurance payments for medical expenses. The plaintiffs in molding the judgments must produce the necessary information so that awards may be reduced to account for such sums already received or reasonably anticipated in the future.

### XI. CALCULATIONS WITH RESPECT TO FUTURE DAMAGES

■ Pursuant to Civil Practice Law and Rules section 4111(f), added in the 1986 tort reform, awards for future damages greater than $250,000, must indicate the years for which the losses will occur. By stipulation of the parties, the jury was instructed to determine the full amount of future damages without any reduction to present value. Section 5041(b) of the Civil Procedure Law and Rules provides that the court should enter judgment in the full amount as a lump sum for damages less than $250,000. For future damages in excess of that amount, the court must calculate the present value of the damage award that exceeds the $250,000. Section 5041(e) states that the court

shall enter a judgment for the amount of the present value of an annuity contract that will provide for the payment of the remaining amounts of future damages in periodic installments. The present value of such shall be determined in accordance with generally accepted actuarial practices by applying the discount rate in effect at the time of the award to the full amount of the remaining future damages....

The maximum period over which such payments may be scheduled is ten, with the annual payments to increase four percent each year.

A reasonable analysis of appropriate discount rates was recently set forth by Judge Jon O. Newman in *In re Connecticut National Bank*, 928 F.2d 39, 42–47 (2d Cir. 1991). In the absence of any contrary evidence the *Connecticut National Bank* figure of two percent must be adopted. It falls squarely within the Supreme Court's suggested range of one to three percent. *See Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 548–49, 103 S.Ct. 2541, 2556–57, 76 L.Ed.2d 768 (1983). This approach is not inconsistent with any state rule required to be followed under *Erie*. The New York statutory rate of nine percent in section 5004 of the Civil Practice Law and Rules does not consider inflation.

A two percent rate takes into account the long-term historical and current interest rates less inflation rates to show probably net earnings on the most conservative investments. *But cf. Ursini v. Sussman*, 143 Misc.2d 727, 541 N.Y.S.2d 916 (N.Y.Sup.Ct.1989) (Gammerman, J.) (7.5% discount rate). Commentators have noted "a significant decrease in interest rates" since *Ursini* and a tendency in state courts to recognize this fact by reducing the discount rate. *See* Kelner & Kelner, *Trends in CPLR Articles 50A and 50B*, N.Y.L.J. Aug. 27, 1991, at 3, 6.

The parties are directed to use Judge Newman's simplified one-step analysis for applying the interest and discount rates to the jury awards where necessary. Where the jury did account for inflation in calculating its award, an appropriate discount rate is the 6.88% based on the one year Treasury Bills suggested by the plaintiffs and not objected to by all defendants.

## XII. ORDER OF COMPUTATION

In supplying proposed final molded judgments in tort reform (Article 16) cases, the plaintiffs have proposed calculations of verdicts that deduct non-settling defendants' credit for settlements against only non-economic damages. Defendants argue that under section 15–108 of the General Obligations Law deductions should be subtracted from the entire award since that statute in contrast with section 1601 of the Civil Practice Law and Rules does not distinguish between economic and noneconomic damages. Because section 1601 provides for joint and several liability of only economic damages, the manner of calculations affects the total amount owed by a particular defendant. The defendants rely in part on section 1601(2) which states:

> Nothing in this section shall be construed to affect or impair any right of a tortfeasor under section 15–108 of the general obligations law.

The parties concede that no court has addressed this question.

A hypothetical will illustrate the point. A plaintiff sues three defendants, A, B and C and obtains a verdict of $100,000, $25,000 of which is allocated to economic damages and $75,000 of which compensates for non-economic damages. The jury apportions fault equally at 33.3% each. Prior to trial defendant A settled with the plaintiff for $39,000.

Plaintiffs' method

| | |
|---|---|
| 75,000 | non-economic damages |
| − 39,000 | settlement credit |
| 36,000 | |
| | divided by 3 for Article 16 share |
| 12,000 | each non-settlors' share |
| + 12,500 | half of economic damages (joint & several liability of B & C) |
| 24,500 | TOTAL owed by each non-settling defendant |

Defendants' method

| | |
|---|---|
| 100,000 | total verdict |
| − 39,000 | settlement credit |
| 61,000 | must calculate portion for unpaid economic damages |
| × 25% | |
| 15,250 | unpaid economic damages divide by 2 for each non-settlor's share |
| 7,625 | each non-settlor's share of economic damages |
| 45,750 | remaining unpaid noneconomic damages divided by three (Art. 16) |
| 15,250 | non-settlor's share of non-economic damages |
| + 7,625 | non-settlor's share of economic damages |
| 22,875 | TOTAL owed by each non-settling defendant |

In contrast with Article 16, the General Obligations Law makes no distinction between types of damages. *See* N.Y.C.P.L.R. § 1601(2). General Obligations Law deductions should be calculated first and subtracted from the total verdict, as requested by the defendants, since Article 16 specifically states that it is not meant in any way to limit the application of section 15–108. This method of calculation adds some complications. It appears, however, to better effectuate the statutory scheme.

### XIII. REMAINING MOTIONS

Plaintiffs and defendants have both submitted motions for a new trial, judgment notwithstanding the verdict, and other motions with respect to findings made by the jury. These motions are denied for the reasons stated on the record in the course of the trial and post-trial arguments.

### XIV. CONCLUSION

The parties shall recompute the verdicts in light of the decisions contained in this memorandum. If possible, the parties should agree on all aspects of the calcula-tions for the final molded judgments. If the parties cannot agree as a result of some ambiguity or question regarding interpretation of this memorandum, they should promptly inform the court. Any disputes concerning mere mathematical computation should be submitted to the Magistrate Judge for resolution.

The parties are encouraged to settle these cases before the litigants are put to further expense and delay in the course of appeals. The Special Master's powers are continued to assist in a resolution of any continuing disputes.

So ordered.